**Todd STYCH, Plaintiff,**

v.

**The CITY OF MUSCATINE, IOWA as a municipal corporation, and Art P. Anderson, individually and in his ca-pacity as a police officer employed by the City of Muscatine, Defendants.**

**No. 4:07–cv–520.**

United States District Court,
S.D. Iowa,
Central Division.

Sept. 18, 2009.

---

Timothy C. Boller, Dunakey & Klatt, PC, Waterloo, IA, Bruce L. Gettman, Jr.,

Redfern Mason Larsen & Moore PLC, Cedar Falls, IA, for Defendants.

Jeffrey K. McGinness, James E. Shipman, Simmons Perrine Moyer & Bergman PLC, Cedar Rapids, IA, for Plaintiff.

## ORDER

ROBERT W. PRATT, Chief Judge.

On January 30, 2008, Plaintiff, Todd Stych ("Plaintiff"), filed an Amended Complaint against the above-captioned Defendants, alleging that he was "forcibly handcuffed, seized, and arrested by Defendant Anderson who was acting within the scope of his employment with the City of Muscatine." Am. Compl. ¶ 5. Specifically, Plaintiff's Amended Complaint asserts that on August 13, 2007,[1] Plaintiff received notification that his son had suffered a potentially serious injury during high school football practice; after receiving this call, Plaintiff immediately drove to Muscatine High School; while Plaintiff was en route to Muscatine High School, Defendant Art P. Anderson ("Anderson") pursued and stopped Plaintiff for an alleged moving traffic violation; and that despite Plaintiff's explanation of the medically emergent purpose of his trip, Anderson "forcefully proceeded with an arrest and, in the course thereof, used excessive and unnecessary force." Id. ¶¶ 6–9. Plaintiff contends that Anderson's actions caused him physical and emotional injuries, and that Anderson is liable for: 1) negligence; 2) negligence per se; 3) assault and/or battery; 4) intentional infliction of emotional distress; and 5) violation of 42 U.S.C. § 1983.

On July 15, 2009, Defendant City of Muscatine ("City of Muscatine") filed a Motion for Summary Judgment. Clerk's No. 37. On the same date, Anderson filed a Motion for Summary Judgment and Request for Oral Argument. Clerk's No. 38. Plaintiff filed a resistance to the Motions for Summary Judgment on August 5, 2009. Clerk's Nos. 40, 41, 43. City of Muscatine filed a Reply on August 21, 2009. Clerk's Nos. 48, 49. Anderson joined in City of Muscatine's Reply on the same date. Clerk's No. 50. Having reviewed the record before it, the Court does not believe that oral arguments will materially aid it in resolving the present motions. Accordingly, the matters are fully submitted.

## I. FACTUAL BACKGROUND

According to Plaintiff, his son, Corey Stych ("Corey"), was participating in football practice at Muscatine High School on the afternoon of August 13, 2007. Pl.'s Statement of Additional Undisputed Material Facts (hereinafter "Pl.'s Facts") ¶ 1. At some time during the practice, Corey sustained a neck injury and collapsed. Id. The athletic trainer, Jess Burgason ("Burgason"), evaluated Corey at the scene. Id. ¶ 2. Burgason did not feel the injury was serious enough to call an ambulance, but she did call Plaintiff to inform him that Corey had been injured and that he should be taken to the emergency room for further evaluation. Id. ¶ 3; Pl.'s App. at 9 (Burgason Dep.).

According to Plaintiff's deposition, he was only a short distance from the high school, in the vicinity of Grace Lutheran Church, when he noticed a police vehicle behind him with its lights on. Pl.'s App. at 22–23. Rather than pull over immediately, Plaintiff "made a motion with [his] right arm inside the car that [he] was going" in the direction of the high school, and he proceeded the remaining distance to Muscatine High School. Id. at 23. Plaintiff drove four-tenths of a mile to the high

---

**1.** Plaintiff's Amended Complaint actually lists August 27, 2007 as the date of the events giving rise to the present lawsuit. All of the testimony in the case, however, indicates that the events occurred on August 13, 2007.

school,[2] parked, and exited his vehicle. *Id.* at 24–25. As Anderson was emerging from his own vehicle, Plaintiff claims that he "turned around to communicate" with Anderson. *Id.* at 25. Plaintiff testified that he remained stationary by his own vehicle's door and did not advance toward Anderson. *Id.* While Plaintiff is uncertain as to who spoke first, it appears that Anderson began shouting at Plaintiff to "get back in the car" at the same time Plaintiff told Anderson that his son was at the practice field with a neck injury. *Id.* According to Plaintiff, he again told Anderson that his "son [was] at the practice field," at which time Anderson "pulled his gun and said, 'Get back in the car.'" *Id.*

Plaintiff testified that he got back in his still-running car and closed the door, though the window was rolled down. *Id.* at 26. Anderson quickly approached Plaintiff's vehicle and said "'[g]ive me your hand.'" *Id.* Plaintiff placed his left hand outside of the car window and Anderson, "[i]n an aggressive fashion," "grabbed [his] hand and pulled it backwards up against the doorjamb of [his] car." *Id.* at 28. Plaintiff, meanwhile, continued to state that his son was on the practice field with an injury. *Id.* Anderson "continued to pull [Plaintiff's left arm], took both hands and twisted [his] wrist, and put [Plaintiff's] arm in a nonnatural position while continuing to apply force." *Id.* Plaintiff admits that, when Anderson did this, he attempted to pull away: "I thought my arm was going to break, it was a natural reflex that I pulled my arm in this motion back away." *Id.* at 30. At some point, Anderson "lost his grip and regripped and kind of retorqued on [Plaintiff's] wrist again." *Id.* at 28. Anderson

then put a handcuff on Plaintiff's left wrist and pulled him from the car. *Id.* Anderson testified: "The door to the car was opened, and I was pulled from the car and then pulled around and thrown down to the ground.... [J]ust one quick movement out and thrown and around, and I was wheeled around and then forced to fall backwards." *Id.* at 29. Plaintiff claims he landed on his bottom on the asphalt and that he hit his elbow and his head.[3] *Id.* at 30. When Plaintiff attempted to sit up, Anderson told him to put his "hands on top of [his] head" and pointed a Taser at him, stating "'I'll use this.'" *Id.* at 30–31. Plaintiff complied, referencing his son again, and Anderson helped Plaintiff stand up, handcuffed him, and placed Plaintiff in the back of a police car. *Id.* at 31–32. According to Plaintiff, he was charged with several violations, but he eventually pled guilty to running a stop sign and paid a $150 fine. *Id.* at 33. The remaining charges were dismissed. *Id.*

Anderson told a somewhat different version of the events of August 13, 2007 during his deposition. Anderson testified that he observed Plaintiff drive down Parham Street and turn right onto Cedar Street without stopping at the stop sign at the intersection. Defs.' Joint App. at 9. Anderson activated his emergency lights. "Mr. Stych saw me and immediately sped up. I hit my siren ... and Mr. Stych sped up again. We were doing 55 miles an hour [in] a 35 mile-an-hour zone." *Id.* Anderson recounted that he did not see Plaintiff make any signals as he proceeded over a half-mile to the high school. Pl.'s App. at 51. As Plaintiff parked his vehicle in the high school driveway, Anderson parked his own vehicle approximately one and one-half car lengths behind him. Defs.' Joint

2. Plaintiff testified that he "was going faster than the speed limit" as he proceeded to the Muscatine High School after noticing the police vehicle. Pl.'s App. at 23.

3. Plaintiff contends that he suffered "an acute right elbow radial head fracture and a left wrist sprain" as a result of Anderson's actions. Pl.'s Br. at 2.

App. at 10. According to Anderson, "Mr. Stych immediately jumped out of the vehicle and started coming back at me." *Id.* Anderson recounted that Plaintiff got out of his vehicle quickly, "thr[ew] back his seat belt," left his door open, and was "coming at [Anderson] aggressively." Pl.'s App. at 54. Anderson noted that Plaintiff "was yelling something, but at that point ... all I wanted to do was get out of my truck and tell him to get back in the car ... I was not listening to him. He had already brought himself up onto a use of force level where the conversation was over. He was doing what I told him to do for my safety." *Id.; see also* Defs.' Joint App. at 10 (Anderson testifying that Plaintiff did say something to him, but that he did not know what Plaintiff said). Anderson "exited [his] vehicle, drew [his] weapon,[4] [and] told [Plaintiff] to get ... back in the vehicle."[5] Defs.' Joint App. at 10. Anderson stated that he told Plaintiff at least twice to get back into his vehicle and that on the second request, Plaintiff complied. Pl.'s App. at 54. As Plaintiff got back in his vehicle, Anderson approached, reholstered his weapon, and told Plaintiff to put his hands outside the vehicle:

> He failed to do that. I finally yelled at him to put his hands outside the vehicle. He finally puts one hand out of the vehicle, and at that moment I took hold of his wrist and placed a handcuff on ... his left hand.... He immediately pulled away from me, started fighting with me, tried to get away from me. That's when I opened up the door and pulled on his arm to get control of him.

4. Assistant Police Chief Michael Scott acknowledged that Muscatine Police policy explicitly states that "unarmed persons should not have a weapon drawn or pointed at them unless a situation reasonably justifies a deadly force situation." Pl.'s App. at 67.

5. Anderson testified that Plaintiff reached approximately the back end of Plaintiff's own

*Id.* At some point after Anderson removed Plaintiff from his vehicle, Anderson lost his grip on the handcuff on Plaintiff's wrist. *Id.* at 56. Fearing he had lost control of the situation and that Plaintiff could now injure him with the handcuff on his wrist, Anderson placed both hands on Plaintiff's chest and pushed Plaintiff as hard as he could, causing Plaintiff to fall backwards onto "his buttocks, his back, the back of his head, and his right elbow." *Id.* Plaintiff attempted to sit up and Anderson pointed a Taser at Plaintiff, ordering him to stay down and put his hands behind his back. *Id.* Plaintiff complied, at which time Anderson applied the second handcuff, assisted Plaintiff to his feet, and walked Plaintiff over to the back of Plaintiff's vehicle to get him out of the roadway. *Id.* Having secured Plaintiff, Anderson now began to listen to him, and Plaintiff told Anderson about his son's injury. *Id.*

Two witnesses also testified about observing the interactions between Anderson and Plaintiff on August 13, 2007. Scott Beatty ("Beatty") testified that, at the time of the altercation between Anderson and Plaintiff, he was sitting in the hatch of his vehicle watching his son's football practice on the front lawn of Muscatine High School. Pl.'s App. at 35–36. Beatty estimates that he was about fifteen feet from where Plaintiff parked his vehicle and that Plaintiff "opened the door, had his hands up in the air, kept screaming that my son is hurt, I need to get to him." *Id.* at 36. Plaintiff exited his vehicle and "aggressively mov[ed] toward" Anderson,[6] repeating

vehicle in his approach toward Anderson. Pl.'s App. at 54.

6. Despite characterizing Plaintiff's movement as "aggressive," Beatty testified that he did not view Plaintiff's approach toward Anderson as hostile; rather it appeared to him that Plaintiff's movements were "not to hurt or attack anyone but to explain quickly

the information about his son with his hands outstretched and facing up. *Id.* at 37. Anderson exited his vehicle, his hand went down by the side of his gun, and he told Plaintiff to stop and get back in his vehicle. *Id.* Plaintiff stopped walking, but continued yelling to Anderson that his son was injured. *Id.* Anderson repeated the command and drew his weapon, and Plaintiff, now approximately 8–10 feet from Anderson, turned around and started walking back to his car. *Id.* at 38. Plaintiff got into his vehicle, Anderson yelled at him to shut the door, and Plaintiff closed the door, continuing to express concern about his son. *Id.* Anderson asked Plaintiff for his left arm. *Id.* Plaintiff asked "why," Anderson told him again to put his left arm out, and Plaintiff complied. *Id.* Beatty described Anderson's grip on Plaintiff as being "a submissive hold to restrain him and force him to comply" and stated that Plaintiff complained that the hold was hurting him and "tr[ied] to get his arm pulled back so it didn't hurt." *Id.* Having secured Plaintiff's left arm, Anderson opened the door and told Plaintiff to stand up. *Id.* at 40. Plaintiff was still complaining that Anderson's hold was hurting him and as soon as he was out of the car, Plaintiff "tried to spin to relieve the pressure of his arm." *Id.* While Beatty's testimony does not clearly state when, exactly, Anderson handcuffed Plaintiff's left hand, at some point after his hand was cuffed, Plaintiff "spun in, facing Officer Anderson," Anderson "turns then he grabs ahold of [Plaintiff] with both hands and pushes him down to the concrete." *Id.* at 41. Beatty characterized the push as "very forceful," and stated that Plaintiff "fell down on his rear end first, elbow hit, right elbow hit hard on the concrete, and head snapped back like whiplash onto the

concrete." *Id.* Anderson then pulled out his Taser, said, "Don't move, freeze," and "went aggressively" to Plaintiff, sat him up, and handcuffed him. *Id.*

Darren Sloan ("Sloan") also witnessed the events of August 13, 2007, while he was attending his son's football practice at Muscatine High School. Pl.'s App. at 45. Sloan observed "Mr. Stych get out of his car with some level of anxiety with his hands up gesturing saying something toward the police officer, which I could not understand . . . or could not hear." *Id.* Plaintiff made a "brisk walk" toward Anderson,[7] and Anderson pulled a weapon and assumed a defensive position. *Id.* Sloan could tell that Anderson was yelling at Plaintiff but could not make out the words. *Id.* at 46–47. According to Sloan, there was a moment where Plaintiff "continued to try to express whatever he was trying to say to the officer and then [Plaintiff] turned around and went back to his vehicle." *Id.* at 47. At this point, Sloan looked away for a period of time. *Id.* When he looked back, Plaintiff's left arm was out the car window, and Anderson "had both hands gripped on Mr. Stych's hand holding it against the car." *Id.* Sloan looked away again because he was "afraid that [Plaintiff's] arm was going to break, and [he] didn't want to see it." *Id.* at 48. When Sloan looked back again, Anderson was putting handcuffs on Plaintiff. *Id.* "His hands were behind his back. There was some stumbling or jostling at some point. The handcuffs were applied and then Mr. Stych and the officer moved out of my line of vision . . . the next thing [I] saw was Mr. Stych hit the concrete. . . ." *Id.* Sloan stated that he believed that Plaintiff was handcuffed at the time he hit the ground because "[h]is hands were be-

---

why he was being that quick—I mean, moving that quick towards the high school." Pl.'s App. at 37.

**7.** Sloan testified that he did not perceive Plaintiff's approach toward Anderson as threatening or hostile. Pl.'s App. at 46.

hind his back, and I had a view of him sitting upright with his hands handcuffed behind his back." *Id.*

Anderson's police vehicle was equipped with an on-board video recording device on August 13, 2007. Officer Danny Antle ("Antle"), a patrol officer under the supervision of Anderson on August 13, 2007, testified that it was "expected procedure by each officer on patrol" to ensure that the video recording equipment in the patrol car is working. Pl.'s App. at 61. Anderson testified that he performed an equipment check prior to commencing his shift on August 13, 2007, but it appears that all Anderson did was toggle the power switch on the unit to "on." *Id.* at 51–52. According to Anderson, once he toggled the switch to "on," he "just figured the switch was on and we were good to go." *Id.* Regardless, while there should have been a video of Anderson's encounter with Plaintiff, the onboard system did not record the events of August 13, 2007. *Id.* at 52–53.

## II. STANDARD OF REVIEW

The plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.,* 541 F.2d 207, 209 (8th Cir.1976) (citing *Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 n.

5 (8th Cir.1975)). The purpose of the rule is " 'not to cut litigants off from their right of trial by jury if they really have issues to try,' " *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)), but to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.,* 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.,* 523 F.2d 340, 347 (8th Cir.1975)).

The precise standard for granting summary judgment is well-established and oft-repeated: summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence nor make credibility determinations; rather, it only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.").

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248,

106 S.Ct. 2505. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See* Fed. R.Civ.P. 56(c), (e); *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### III. LAW AND ANALYSIS

Defendants contend that summary judgment must be granted in their favor on Plaintiff's claims for a variety of reasons. First, Defendants argue that they are immune from liability for Plaintiff's state law claims under Iowa Code § 670.4(11). Second, City of Muscatine argues that it cannot be held vicariously liable for Plaintiff's claims against Anderson. Third, Anderson asserts that he is entitled to qualified immunity from Plaintiff's § 1983 claims. The Court will address each argument in turn.

#### A. *Iowa Code § 670.4(11)*

■ Defendants first claim immunity from liability on Plaintiff's state law claims on the basis of the emergency response exception in Iowa Code § 670.4(11). Iowa Code Chapter 670 provides that every city is subject to liability for the torts of its officers and employees, unless such torts fall within one of the exemptions listed in § 670.4. One of these exemptions, § 670.4(11), provides that a municipality is immune from liability for claims "based upon or arising out of an act or omission in connection with an emergency response including but not limited to acts or omissions in connection with emergency response communications services." Iowa Code § 670.12 extends the immunity under § 670.4(11) to officers and employees of municipalities: "All officers and employees of municipalities are not personally liable for claims which are exempted under section 670.4, except claims for punitive damages, and actions permitted under section 85.20." Defendants argue that the present facts demonstrate that Anderson made an emergency response after he personally observed Plaintiff fail to stop at a stop sign controlling his lane of travel, began pursuing Plaintiff as he traveled at speeds over the speed limit, and made an arrest of Plaintiff once Plaintiff actually stopped. Plaintiff resists application of emergency response immunity on the basis that a genuine issue of material fact exists on the question of "whether Officer Anderson's use of excessive force was taken in connection with an emergency." Pl.'s Br. at 8.

■ Case law has interpreted § 670.4(11) broadly, finding that the words "in connection with" demonstrate a legislative intent to cover a wide range of situations. *Adams v. City of Des Moines,* 629 N.W.2d 367, 370 (Iowa 2001) (citing *Kulish v. Ellsworth,* 566 N.W.2d 885, 891 (Iowa 1997)). Under Iowa Supreme Court precedent, the relevant inquiry in determining whether Defendants are entitled to immunity under § 670.4(11) is "whether it can be said as a matter of law that an emergency existed" at any time during the events of August 13, 2007. *Keystone Elec. Mfg., Co. v. City of Des Moines,* 586 N.W.2d 340, 350 (Iowa 1998). The Iowa Code does not define either "emergency" or "emergency response" as those terms

are used in § 670.4(11). Oxford English Dictionary, however, defines the term "emergency" as "a state of things unexpectedly arising, and urgently demanding immediate action." Oxford English Dictionary (2d ed.1989).

In *Kulish*, the Iowa Supreme Court articulated the justification for the emergency response exception to the statutory waiver of sovereign immunity:

A local government has a strong interest in providing rescue services for citizens involved in accidents and who—day or night—need immediate response. The statutory exemption from tort liability allows municipal providers of emergency care to render necessary medical aid in dire situations free from distractions or concerns over potential lawsuits.

566 N.W.2d at 890 (affirming that the emergency response provision is constitutional as reasonably related to a legitimate governmental interest). With this justification in mind, the Court, having reviewed the record, finds that the facts in this case are not sufficient to constitute an "emergency" that necessitated an "emergency response" from Anderson.

According to Anderson, Plaintiff first failed to make a complete stop at a stop sign. If routine traffic violations such as failure to stop at a stop sign are deemed emergencies, there is little doubt that the emergency response *exception* would swallow the rule that municipalities are ordinarily liable for tortious acts under the statutory waiver of sovereign immunity. Indeed, the Court can think of virtually no situation where municipalities or their employees could be held liable for tortious conduct were such a low threshold for "emergency" employed.

A slightly more compelling argument for finding an "emergency" necessitating an "emergency response" exists based on Plaintiff's failure to stop when Anderson approached him from behind with lights and siren activated. Defendants point to *Cubit v. Mahaska County*, a case where "a high speed chase of a fleeing criminal suspect was determined to be within the broad definition of an emergency response under § 670.4(11)," as providing a "similar situation" to the present case. City of Muscatine's Br. at 4; *see Cubit*, 677 N.W.2d 777, 779 (Iowa 2004). In *Cubit*, an individual called 911 to report a domestic assault by Loyd Hanson. On the basis of the call, dispatchers informed officers that Hanson was known to go armed and was believed to be intoxicated and driving a blue vehicle. 677 N.W.2d at 779. A short while later, Hanson's girlfriend called dispatch to report that Hanson had just called her and stated he was surrounded by police and was going to kill himself by crashing into the police. *Id.* While the dispatcher was suspicious of the call because police had not yet located Hanson, she nonetheless reported it to her supervisor, Cheryl Eklofe. *Id.* A few minutes later, police located Hanson's vehicle and a pursuit ensued. *Id.* Brad Cubit, an Iowa State Patrol trooper, responded to a broadcast request for assistance with the pursuit. *Id.* at 780. Moments later, Eklofe made two broadcasts that Hanson was suicidal, but Cubit did not hear them. *Id.* Having been informed that Hanson was approaching Cubit's location, Cubit stopped his vehicle, laid stop sticks across the roadway, and assumed a waiting position in front of his patrol car. *Id.* As Hanson approached the stop sticks, he drove his vehicle directly into Cubit's patrol car, causing it to hit Cubit and causing Cubit injury. *Id.*

*Cubit* is easily distinguishable from the present case. First, in *Cubit*, the court was not called upon to determine whether the "high speed chase" actually constituted an "emergency situation" because both parties conceded that it did. *Id.* at 781 ("The plaintiff concedes the high speed chase ... was an emergency situation.

Consequently, it cannot be disputed that the actions of the county's E–911 dispatcher[s] ... occurred 'in connection with emergency response communications services.' "). Second, the "high speed chase" in *Cubit* actually resulted from a call to 911 that reasonably could be construed as alerting police to an emergency situation that required an emergency response. Hanson had just committed a crime of domestic violence, fled the scene, and was possibly operating a motor vehicle while armed and intoxicated. An emergency response on such facts is warranted because Hanson was accused of serious criminal activity and posed a potentially deadly risk to other drivers and to anyone else who might encounter him. In contrast, even if the Court accepts Anderson's version of events as true in the present matter, Plaintiff, at worst, ran a stop sign and, in failing to immediately pull over in response to Anderson's lights and siren, traveled at approximately 55 miles-per-hour in a 35 mile-per-hour zone for a distance of just over one-half a mile. *See* Defs.' Joint App. at 9, 51. This approximately 32 second[8] pursuit hardly qualifies as a "high speed chase," despite Defendants' efforts to characterize it as such. *See* Defs.' Reply Br. at 5 ("[T]here is no dispute, that the alleged

excessive force at issue was preceded by a high speed chase which can only be characterized as an 'emergency response' under Iowa Code § 670.4(11)."). Indeed, the Court finds that the facts as alleged by Anderson fall far short of being comparable to any situation in Iowa case law that has supported application of the emergency response exception. *See, e.g., Kershner v. City of Burlington*, 618 N.W.2d 340, 342–43 (Iowa 2000) (finding the emergency response exception shielded the City of Burlington from a negligence claim where the alleged negligent actions occurred in connection with firefighters' response to a 911 call reporting a dryer fire in a residence); *Kulish*, 566 N.W.2d at 888 ("The assertion by plaintiffs that this case is not based on an emergency response cannot be taken seriously. The suit centers on defendants' response to a two-car collision that required the dispatch of two ambulances, extraction of Kulish from his overturned van in a ditch, transport to the nearest hospital for emergency care to stabilize the patient, and then immediate transport to the Mayo Clinic for critical care not available in Cresco, Iowa."); *Harrod v. City of Council Bluffs*, No. 07–0864, 2008 WL 2200083, at *1 (Iowa Ct.App. May 29, 2008);[9] *Olson v. Polk County*, No.

---

8. It would take approximately 32 seconds to travel one-half a mile at a rate of 55 miles-per-hour.

9. Defendants cite *Harrod* as another case that supports application of the emergency response exception to the present facts. In *Harrod*, Kristian Harrod, his brother, and his girlfriend were in a parked vehicle waiting to pick up a friend from work. *Id.* A man walking by brandished a handgun and forced his way into the car. *Id.* Unhappy with the amount of money the vehicle's occupants had, the man forced them to drive to Harrod's girlfriend's house to get more money. *Id.* at *2. Harrod's girlfriend went inside the house to get some money and called 911, telling the dispatcher about the carjacking and the fact that her boyfriend and his brother were still

in the vehicle with the carjacker. *Id.* Responding officers ultimately fired shots at the vehicle, seriously injuring Harrod. *Id.* The Iowa Court of Appeals determined that the emergency response exception "clearly" was applicable to immunize the responding officers from Harrod's negligence claims. *Id.*

As Defendants point out, *Harrod* clearly established that the emergency response exception is not limited to emergency response communications services; rather it is equally applicable to police officers, state troopers, and municipal firefighters, amongst others. *Id.* The Court fails to see, however, how an armed carjacking in progress can even arguably be compared to the present factual scenario. As in *Cubit*, the situation at issue in *Harrod* clearly was an "emergency" situation

06–0436, 2006 WL 3614063, at *1 (Iowa Ct.App. Dec. 13, 2006) (finding the exception applicable in a situation where an officer dispatched to investigate vehicles in a ditch undertook traffic control measures after discovering icy road conditions and observing several more vehicles slide off the roadway); *Abell v. Winterset Fire Fighters Ass'n, Inc.*, No. 05–0544, 2005 WL 3116111, at *1 (Iowa Ct.App. Nov. 23, 2005) (finding exception applicable where officers were called in response to a grass fire). While the Court does not discount the potential hazards that *could* arise from an individual's failure to stop at a stop sign, speeding, or failing to immediately pull over for a police officer, on the present facts, there is simply no evidence that Anderson was attempting to provide "rescue services" or "necessary medical aid," *see Kulish,* 566 N.W.2d at 890, nor is there any evidence that Plaintiff's actions created a serious threat to life and limb or a danger to the public.

Even assuming that the emergency response exception could be read so broadly as to encompass the facts of this case, summary judgment would still be improper. As noted, in determining the applicability of the emergency response exception, the Court must assess "whether it can be said as a matter of law that an emergency existed" during the events of August 13, 2007. *Keystone,* 586 N.W.2d at 350. According to Anderson, Plaintiff ran a stop sign, "evaded" Anderson by speeding for approximately one-half mile and, upon stopping, approached Anderson in an aggressive manner. Plaintiff contends, however, that he did not immediately notice Anderson behind him, and that when he did, he "made a motion with [his] right arm" in an effort to communicate to Anderson that he was going to proceed to the high school. Pl.'s App. at 23–24. Plaintiff testified that he maintained his same speed of travel, and that he traveled only an additional four-tenths of a mile after noticing Anderson behind him. *Id.* Moreover, Plaintiff, Beatty, and Sloan each testified that Plaintiff was not hostile and that he, at all times, was attempting to explain to Anderson that his actions were only in an effort to get to his injured son as quickly as possible. Construing the facts in the light most favorable to Plaintiff, as it must in the context of the present motions, there are clearly material facts in dispute that would prohibit a determination as a matter of law that an emergency actually existed during the events of August 13, 2007. *See Keystone,* 586 N.W.2d at 350 (reversing the district court's grant of summary judgment in favor of a defendant under the emergency response exception because there was a genuine issue of material fact regarding the existence of an "emergency").

### B. *Vicarious Liability*

City of Muscatine next contends that it cannot be held vicariously liable for Plaintiff's assault, battery, and intentional infliction of emotional distress claims against Anderson.[10] " 'A claim of vicarious liability under the doctrine of respondeat

---

requiring an immediate emergency response from law enforcement because lives potentially hung in the balance.

10. City of Muscatine also argues that it cannot be held vicariously liable for Anderson's actions with regard to Plaintiff's § 1983 claim. The Supreme Court in *Monell v. Department of Social Services* clearly established that a municipality may not be held liable for violations of § 1983 through the doctrine of

*respondeat superior.* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff concedes City of Muscatine's argument in this regard. *See* Pl.'s Br. at 25 ("Plaintiff agrees that summary judgment should be granted in favor of the City of Muscatine as to Plaintiff's section 1983 claim."). Accordingly, City of Muscatine's Motion for Summary Judgment is granted with respect to Plaintiff's § 1983 claim.

superior rests on two elements: proof of an employer/employee relationship, and proof that the injury occurred within the scope of that employment.'" *Godar v. Edwards,* 588 N.W.2d 701, 705 (Iowa 1999) (quoting *Biddle v. Sartori Mem'l Hosp.,* 518 N.W.2d 795, 797 (Iowa 1994)). City of Muscatine contends that because Plaintiff's tort claims are supported by expert testimony that Anderson failed to follow Muscatine Police Department policies and procedures in arresting Plaintiff, Plaintiff "will necessarily have to prove that Defendant Anderson acted outside the scope of employment as a Muscatine Police Officer," such that Plaintiff cannot satisfy the second element of respondeat superior liability. City of Muscatine's Br. at 6–7 ("Obviously, since Plaintiff alleges that Defendant Anderson failed to follow the directives of the City, Plaintiff bases his claims upon acts occurring outside the scope of employment for which the City cannot be held vicariously liable.").

■ The Iowa Supreme Court reiterated the principles of respondeat superior liability under Iowa law in *Godar v. Edwards:*

We have said that for an act to be within the scope of employment the conduct complained of "must be of the same general nature as that authorized or incidental to the conduct authorized." Thus, an act is deemed to be within the scope of one's employment "where such act is necessary to accomplish the purpose of the employment and is intended for such purpose." The question, therefore, is whether the employee's conduct "is so unlike that authorized that it is 'substantially different.'" Said another way, "a deviation from the employer's business or interest to pursue the employee's own business or interest must be substantial in nature to relieve the employer from liability."

*Godar,* 588 N.W.2d at 705–06 (quoting *Sandman v. Hagan,* 261 Iowa 560, 154 N.W.2d 113, 117 (1967)). The question of whether an act is within the scope of an employee's employment is ordinarily one for the jury. *Id.* at 706. Factors to be considered include:

(a) whether or not the act is one commonly done by such servants;

(b) the time, place and purpose of the act;

(c) the previous relations between the master and the servant;

(d) the extent to which the business of the master is apportioned between different servants;

(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(I) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

*Id.* (quoting Restatement (Second) of Agency § 229(2) (1957)). "[T]he ultimate question in determining whether an employee's conduct falls within the scope of employment is whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business in which the servant is employed." *Id.* (citing Restatement (Second) of Agency § 229 cmt. a).

In the present case, the mere fact that Plaintiff alleges Anderson violated police policies and procedures in his interaction with Plaintiff does not alone support summary judgment in favor of City of Muscatine on the question of vicarious liability. Indeed, compliance with stated policies and procedures is merely one factor amongst many to be considered in the analysis of whether Anderson was acting within the scope of his employment as a police officer for the City of Muscatine. Regardless, even assuming that Anderson did, in fact, act contrary to Muscatine Police policies and procedures, there would still remain genuine issues of material fact as to whether Anderson's deviations from City policies and procedures were so "substantial" that City of Muscatine should be relieved from liability. City of Muscatine's request for summary judgment is, therefore, denied.

### C. *Qualified Immunity*

 Defendant Anderson argues that his use of force was reasonable and that he, therefore, is entitled to the benefits and protections of the qualified immunity doctrine. "Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Brown v. City of Golden Valley,* 574 F.3d 491, 495 (8th Cir. 2009) (citing *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). "Qualified immunity involves the following [ ] inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* at 496 (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). The district court may determine in its "sound discretion" which of the "two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (overruling *Saucier's* mandate that the two prongs of analysis be considered in sequence); *see also Rush v. Perryman,* 579 F.3d 908, 912–13 (8th Cir.2009) (recognizing *Pearson's* change to the *Saucier* analysis).

In the present case, Plaintiff contends that Anderson violated his Fourth Amendment right to be free from excessive force during the course of a traffic stop and arrest. "The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." *Guite v. Wright,* 147 F.3d 747, 750 (8th Cir.1998). Accordingly, the question before the Court is whether Plaintiff has stated sufficient facts to make out a violation of that right. The Court applies the Fourth Amendment "reasonableness standard" in evaluating Plaintiff's claim of excessive force:

> The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Henderson* [*v. Munn* ], 439 F.3d [497,] 502 [ (8th Cir.2006) ] (quoting *Littrell v. Franklin,* 388 F.3d 578, 583 (8th Cir.2004) and *Greiner v. City of Champlin,* 27 F.3d 1346, 1354 (8th Cir.1994)) (internal quotations omitted).

We evaluate the reasonableness of an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. This calculus allows "for the fact that police officers are often forced to make split-second decisions-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Id.* at 397, 109 S.Ct. 1865. The reasonableness inquiry, however, is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* Circumstances relevant to the reasonableness of the officer's conduct include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. 1865. *Brown*, 574 F.3d at 496 (some citations omitted).

Anderson likens the present case to *Wertish v. Krueger* while Plaintiff likens it to *Brown v. City of Golden Valley*. *See Wertish*, No. 03–5163, 2004 WL 2554457 (D.Minn. Nov. 5, 2004); *Brown*, 574 F.3d at 491. In *Wertish*, Norman Krueger, a police officer, responded to a report that a vehicle had been forced off the road by an erratic driver in a red pickup truck. 2004 WL 2554457, at *1. Upon locating the red pickup truck, Krueger observed it veer onto the shoulder and back onto the roadway. *Id.* Krueger activated his lights, but the truck did not stop. *Id.* Krueger momentarily activated his siren and the truck slowed, pulled to the shoulder, then sped up again. *Id.* In continuing to pursue the truck, Krueger observed several erratic movements, convincing him that the truck's driver was drunk. *Id.* Eventually, the truck stopped and the driver, actually suffering from diabetic hypoglycemia, slumped over the wheel. *Id.* at *2. Krueger approached the truck with his sidearm drawn and ordered the visibly disoriented driver out of the vehicle. *Id.* The driver unsuccessfully tried to open the door, so Krueger attempted to break the window with the butt of his gun. *Id.* The driver ultimately was able to unlock the door lock. *Id.* After the door was open, Krueger grabbed the driver's shirt collar and threw him to the ground head first. *Id.* Krueger holstered his weapon and put a knee in the driver's back while attempting to handcuff him. *Id.* The driver repeatedly asked, "What did I do?," but did not respond to commands to put his hands behind his back. *Id.* This caused Krueger to become concerned that the driver was attempting to reach a knife protruding from his front pants pocket, so Krueger seized the knife and threw it into the roadway. *Id.* When the driver lifted his head to look around, Krueger struck him in the back of the head. *Id.* While placing handcuffs on the driver, Krueger twisted his arms behind his back and hit, kicked, or kneed him several times. *Id.* After handcuffing the driver, Krueger picked him up and threw him against the truck, whereupon the driver told Krueger that he was suffering from a diabetic condition. *Id.* Finding it a "close question," the district court determined that Krueger acted reasonably given the exigencies of the situation, such that he was entitled to qualified immunity. *Id.* at *5. The district court noted, in particular, the driver's possession of a small knife, the failure of the driver to pull over for a five mile stretch of highway, and the fact that Krueger was unaware of the driver's diabetes, as factors that made Krueger's use of force reasonable under the circumstances. *Id.*

In *Brown*, law enforcement officers effectuated a traffic stop against Richard and Sandra Brown. 574 F.3d at 493.

Upon noticing the lights behind him, Richard, the driver, looked for a safe place to pull over. *Id.* Since the right shoulder was inaccessible, he pulled onto the left side of the left lane and exited the vehicle. *Id.* at 494. Richard was immediately ordered back into the car and he complied. *Id.* Three officers came to his window and asked if he knew why he had been pulled over. *Id.* When Richard replied that he did not know, one of the officers opened the car door, pulled Richard out, threw him against the side of the vehicle, and handcuffed him. *Id.* Sandra sat quietly in the passenger seat while this occurred. *Id.* Frightened by the officers' behavior and demeanor, Sandra called 911 on her cell phone after Richard was handcuffed. *Id.* Rob Zarrett, an officer who had arrived at the scene, "yanked open the passenger's side door" and told Sandra to get off the phone with the 911 operator. *Id.* Sandra replied that she was frightened and wanted to stay on the phone with the 911 operator. *Id.* Zarrett ordered her again to get off the phone. *Id.* When Sandra again replied that she was frightened, Zarrett "applied the prongs of his Taser to Sandra's upper right arm, grabbed her phone and some of her hair, and threw the phone out the driver's side door onto the shoulder." *Id.* Zarrett then pulled Sandra out of the car, and he and another officer escorted her to the police car, handcuffed her, and placed her inside. *Id.*

Zarrett recalled the incident differently than Sandra. *Id.* Zarrett stated that, upon arriving at the scene, he and another officer ordered Sandra off the phone. *Id.* Sandra refused. *Id.* Zarrett noticed two glasses at Sandra's feet, possibly containing alcohol. *Id.* He ordered Sandra off the phone again, and she refused again. *Id.* As soon as Zarrett opened the passenger door, Sandra "scooted away from the door and pulled her knees towards her chest." *Id.* Zarrett believed she might be intoxicated. *Id.* Zarrett claimed that he unhol-

stered his Taser in front of Sandra and told her he would use it if she did not comply with his commands. *Id.* "When Sandra was not looking, Zarrett grabbed her phone, threw it on the driver's seat, and applied the Taser to Sandra's upper right arm for an estimated two to three seconds." *Id.* He and another officer then escorted a resisting Sandra to the squad car. *Id.*

In affirming the district court's denial of qualified immunity to Zarrett, the Eighth Circuit stated that it was "not convinced that Zarrett's use of force was objectively reasonable as a matter of law." *Id.* at 496. The Court noted that Sandra was suspected, at worst, of committing a misdemeanor open bottle violation and that she "was not actively resisting arrest or attempting to flee." *Id.* at 497. With regard to certain variations between Zarrett's story and Sandra's story, the Court found the matters appropriate for jury resolution. *See id.* at 497 ("Zarrett's contention that he thought Sandra might kick him when she raised her knees to her chest while cowering in the car might be accepted by a jury, but a jury could just as well interpret that conduct as an instinctive self-protective reaction consistent with Sandra's fear. . . . Whether Zarrett reasonably interpreted her refusal [to get off the phone with the 911 operator] as a realistic threat to his personal safety or whether it constituted nothing more than an affront to his command authority is a matter for a jury to decide."). The Court further noted that "it is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Id.* at 499.

The Court finds the present case more comparable to *Brown* than to *Wertish.* Here, Anderson initiated a traffic stop against Plaintiff for a misdemeanor of-

fense—failing to stop at a stop sign. Like the driver in *Wertish,* Plaintiff did not immediately stop in response to Anderson's lights and siren. Plaintiff, however, testified that he signaled to Anderson that he was going to stop farther up the road and, in fact, Plaintiff stopped within a relatively short distance and in a relatively short period of time.[11] While Anderson testified that he perceived Plaintiff's approach toward him as "aggressive," Plaintiff and two witnesses testified that Plaintiff was not hostile in his actions toward Anderson. In contrast to the driver in *Wertish,* Plaintiff did not have a weapon and, according to Anderson's own testimony, Plaintiff complied with Anderson's second command to get back in his vehicle and with Anderson's second request to place his hand outside the window. While Anderson testified that Plaintiff "was fighting with him" after having a handcuff placed on his wrist, Plaintiff and the witnesses testified that Plaintiff was simply trying to move his arm out of a painful position. Further, and most importantly, Plaintiff and Beatty both testified that Plaintiff attempted from the moment he stopped his vehicle to inform Anderson about his son's injury, but Anderson would not listen.[12] Indeed, according to Plaintiff and the witnesses, Plaintiff continued to tell Anderson about his son's injury over and over again, but Anderson never acknowledged Plaintiff's pleas. Thus, unlike *Wertish,* Anderson arguably had information in his possession that a reasonable jury could conclude obviated the need for any level of force, let alone for the level of force Anderson actually employed.

On the present record, as was the case in *Brown,* "both the undisputed facts and [Plaintiff's] version of the disputed facts in this case" make it impossible for the Court to conclude as a matter of law that Anderson's use of force against Plaintiff was objectively reasonable. *See Brown,* 574 F.3d at 498. While a reasonable jury could accept Anderson's version of events and find the level of force used to be objectively reasonable under the circumstances, a reasonable jury could also accept Plaintiff's version of events and conclude that Anderson's use of force far exceeded the level reasonably necessary in the situation. *See Brown,* 574 F.3d at 499. Accordingly, the Court concludes that "there is a genuine issue of material fact as to whether [Anderson] used excessive force in violation of [Plaintiff's] constitutional rights." As such, Anderson's request for qualified immunity on Plaintiff's § 1983 claim is denied.

## IV. CONCLUSION

For the reasons stated herein, City of Muscatine's Motion for Summary Judgment (Clerk's No. 37) is granted on Plaintiff's § 1983 claim, but denied in all other respects. Anderson's Motion for Summary Judgment (Clerk's No. 38) is denied.

IT IS SO ORDERED

---

11. According to Anderson, Plaintiff went another half-mile before stopping. As noted, at speeds of 55 miles-per-hour, Plaintiff would have stopped within a period of approximately 32 seconds.

12. Plaintiff has presented testimony from two witnesses attesting to how important it is for police officers to listen. Pl.'s App. at 60 (Officer Dan Antle testifying in deposition as follows: Q: "Do you believe it's a minimum standard of care and practice for a prudent, well informed, trained peace officer to listen?" A. "Yes."); 66 (Assistant Police Chief Michael Scott testifying that "Officers are expected to listen to help them create a totality of the circumstances when it is feasible").