# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1640

_____

Sandra Brown,     *

           *

     Plaintiff/Appellee,     *

           *

    v.     *

           *    Appeal from the United States

City of Golden Valley,     *    District Court for the

           *    District of Minnesota.

     Defendant,     *

           *

Rob Zarrett, Golden Valley Police     *

Officer,     *

           *

     Defendant/Appellant.     *

_____

Submitted: December 12, 2008
Filed: July 22, 2009

_____

Before WOLLMAN, RILEY, and SHEPHERD, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Golden Valley, Minnesota, Police Officer Rob Zarrett appeals from the district court's[1] denial of his motion for summary judgment based upon qualified and official

_____

[1]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

immunity in Sandra Brown's action against him arising from Zarrett's application of a Taser during a traffic stop.[2] We affirm.

I.

Sandra Brown and her husband, Richard Brown (we will hereinafter refer to the Browns individually by their first names), had plans to meet friends for dinner at a downtown Minneapolis restaurant on Friday, October 8, 2005. After returning home from work, the Browns each had a cocktail, which they finished drinking at the end of their driveway. Rather than returning the glasses to the house, they put them in the car and went to meet their friends.

The Browns arrived at the restaurant around 6:30 p.m. and had dinner. Throughout the evening, Sandra had two more alcoholic drinks—a cocktail and a glass of wine—as well as coffee and water. Richard had a couple glasses of wine. They left the restaurant around midnight, with Richard driving and Sandra riding in the front passenger's seat.

Traveling west on Highway 394, the Browns noticed a squad car with flashing lights behind their car, which was being driven in the left lane. The Browns did not think that the squad car was attempting to stop them, so Richard moved to the right lane to allow the squad car to pass. When the squad car followed the Browns into the right lane, Richard slowed down and looked for a place to pull over. There was road construction on Highway 394 and the right shoulder was barricaded and inaccessible, so Richard moved into the left lane and pulled over onto what the Browns described as the "sane lane."

---

[2]Ms. Brown voluntarily dismissed her claims against the city of Golden Valley and her claim for false arrest against Zarrett.

As Richard opened his door and began to step out of the car, an officer ordered him to get back into the car. Richard complied with the order, pulling his leg back into the car and closing the car door. He rolled down the window, whereupon three officers came to his side of the car. One officer asked Richard if he knew why he had been stopped, to which Richard replied that he did not. At that point, one of the officers opened the door, pulled Richard out of the car, threw him against the side of the vehicle, and handcuffed him. All the while, Sandra sat quietly in the passenger's seat.

As Zarrett was responding to a radio call in Golden Valley, he heard that a St. Louis Park police officer was attempting to pull over a car on Highway 394 and that the driver was not stopping. After clearing the Golden Valley call, Zarrett responded to the St. Louis Park call. Before arriving on the scene, he heard a radio update that the car had pulled over into the left lane and that the driver was getting out of the car and refusing to get back into the car. As Zarrett arrived at the scene, two officers were escorting Richard to a squad car.

The officers' behavior and demeanor frightened Sandra. She thought that the officers were aggressive and that the traffic stop was different from any that she had previously witnessed. The officers did not ask for Richard's license, registration, or proof of insurance, and they did not tell him what illegality he had committed that provoked the stop. Shortly after Richard was handcuffed, Sandra called 911 on her cell phone. She explained what had happened to the operator and was transferred to a different operator.

During her conversation with the second operator, Sandra heard someone yell, "She is on 911. She is on 911." As the 911 operator tried to reassure Sandra, Zarrett, who was accompanied by two other officers, yanked open the passenger's side door and yelled, "Get off the phone." Sandra replied that she was very frightened and that

she wanted to stay on the phone with the 911 operator. Zarrett again ordered Sandra to get off the phone, to which she repeated that she was frightened.

Without another word, Zarrett applied the prongs of his Taser to Sandra's upper right arm, grabbed her phone and some of her hair, and threw the phone out the driver's side door onto the shoulder. Sandra does not remember whether she or one of the officers unfastened her seatbelt, but in any event Zarrett grabbed her right arm and pulled her out of the car, bending her arm behind her back. At that point, a second officer took her left arm and bent it behind her back. Zarrett and the other officer then escorted Sandra to a police car. Sandra tried to walk on her tiptoes to alleviate the pain from the escort hold. She described the escort as a mix between walking and being lifted. In response to Zarrett's command to stop resisting, Sandra replied that she was not trying to resist. Upon reaching the police car, Sandra was handcuffed and placed inside the car.

Sandra was taken to the Golden Valley police station. Richard, who had refused the portable breath test offered at the traffic stop, was taken to the St. Louis Park police station, where, after taking two breathalyzer tests, he was ticketed for speeding. Sandra was charged with obstruction of legal process and an open bottle violation. Following the booking procedures, the Browns took a taxi home.

The prosecution of the charges against Sandra was later suspended under an agreement that the charges would be dismissed after successful completion of certain conditions.

Sandra claims that she suffered extreme pain when Zarrett administered the Taser shock. She felt a sharp pain where the Taser met her arm, with the pain radiating from her upper arm and causing her muscles to clench. Sandra sustained bruises on her wrists and arms and red welts or marks on her upper arm. On the Monday after her arrest, she visited her primary care physician, who prescribed anti-

-4-

anxiety medication. Sandra had never before been diagnosed with depression or an anxiety disorder. After the incident, Sandra experienced problems with sleeping and difficulty in focusing. She visited a psychologist twice. She is now afraid of the police. When she sees them her heart rate increases, a rash sometimes breaks out, and she occasionally hyperventilates.

Zarrett has a different recollection of the incident. After arriving at the scene, he approached the driver's side door with another officer, who ordered Sandra to get off the phone. She refused. Zarrett noticed that there were two glasses at Sandra's feet, possibly containing alcohol. After the officers walked around to the passenger's side door, Zarrett ordered Sandra to get off the phone, only to be told that she would not do so. Zarrett also says that he repeatedly told Sandra to unfasten her seat belt. As Zarrett opened the passenger's side door, Sandra scooted away from the door and pulled her knees towards her chest. Zarrett thought Sandra looked disheveled and believed that she might be intoxicated.

According to Zarrett, Sandra watched as he unholstered his Taser and removed the air cartridge, and he told Sandra that he would use his Taser if she did not comply. When Sandra was not looking, Zarrett grabbed her phone, threw it on the driver's seat, and applied the Taser in drive stun mode to Sandra's upper right arm for an estimated two to three seconds.[3] Sandra then unfastened her seat belt, whereupon Zarrett removed her from the car and arrested her. With the help of another officer, Zarrett

_____

[3]Zarrett testified that the Taser causes electrical muscular disruption and that a full Taser cycle lasts five seconds and delivers a 50,000 volt shock. The Taser's air cartridge contains two darts that can be deployed and will penetrate the skin, causing electrical muscular disruption between the two darts. Zarrett explained that if the air cartridge is removed, the Taser may be operated in drive stun mode and used as a pain compliance tool. In drive stun mode, the Taser's electrical probes are applied directly to the person and the electrical muscular disruption occurs between the two probes.

escorted Sandra to his squad car. Sandra resisted the escort, despite repeated commands that she cooperate.

## II.

Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known. Hope v. Pelzer, 536 U.S. 730, 739 (2002); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Henderson v. Munn, 439 F.3d 497, 501 (8th Cir. 2006). We review *de novo* a district court's denial of summary judgment on the basis of qualified immunity. Henderson, 439 F.3d at 501. We view the facts in the light most favorable to the plaintiff, accepting as true the facts that the district court found were adequately supported, as well as the facts the district court likely assumed. Id.; see also Walker v. City of Pine Bluff, 414 F.3d 989, 991 (8th Cir. 2005).

Qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. Saucier v. Katz, 533 U.S. 194, 201 (2001); see also Pearson v. Callahan, 129 S. Ct. 808, 818 (2009) (holding that courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first).

## A.

Our initial inquiry is whether the facts alleged support Sandra's contention that Zarrett violated her Fourth Amendment right to be free from excessive force during the course of the traffic stop and her arrest. We analyze excessive force claims in the context of seizures under the Fourth Amendment, applying its reasonableness

standard. Henderson, 439 F.3d at 502. The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396 (1989). "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." Henderson, 439 F.3d at 502 (quoting Littrell v. Franklin, 388 F.3d 578, 583 (8th Cir. 2004) and Greiner v. City of Champlin, 27 F.3d 1346, 1354 (8th Cir. 1994)) (internal quotations omitted).

We evaluate the reasonableness of an officer's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. This calculus allows "for the fact that police officers are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 397. The reasonableness inquiry, however, is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." Id. Circumstances relevant to the reasonableness of the officer's conduct include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396; see also Howard v. Kansas City Police Dep't, No. 08-2448, 2009 WL 1885495 at *3 (8th Cir. July 2, 2009).

Given the circumstances surrounding the Tasering and arrest, we are not convinced that Zarrett's use of force was objectively reasonable as a matter of law. Sandra's conduct did not amount to a severe or violent crime. Zarrett suspected that Sandra had committed an open bottle violation, a misdemeanor punishable by not more than ninety days' imprisonment or a fine of not more than $1,000, or both. Minn. Stat. §§ 169A.35 (open bottle law); 609.03(3) (punishment when not otherwise

fixed). Zarrett contends that the district court failed to consider the seriousness of the crimes of fleeing from an officer in a motor vehicle and driving while intoxicated. Whatever the officers' suspicions may have been with respect to Richard's possible intoxication, they had no reason to believe that Sandra had had anything to do with the manner in which Richard had responded to their flashing lights. Accordingly, the district court did not err in determining that the crime at issue was Sandra's potential violation of Minnesota's open bottle law.

Sandra posed at most a minimal safety threat to Zarrett and the other officers and was not actively resisting arrest or attempting to flee. In light of the fact that Zarrett testified that he had ample time in which to come around from the driver's side of the car to the passenger's side, there is nothing to indicate that he was faced with the need to make any split-second decisions, nor can the circumstances fairly be described as constituting a "tense, uncertain, and rapidly evolving" situation. Graham, 490 U.S. at 397. As for Zarrett's argument that the two glass tumblers at Sandra's feet could be used as weapons, his deposition testimony that "It's not something I would rule out. It's something easily accessible," is hardly the description of an officer in fear of being physically attacked. There was no indication that Sandra would use the tumblers to harm the officers. She did not reach for them, and she did not threaten the officers, verbally or physically. Zarrett's contention that he thought Sandra might kick him when she raised her knees to her chest while cowering in the car might be accepted by a jury, but a jury could just as well interpret that conduct as an instinctive self-protective reaction consistent with Sandra's fear. In a word, then, nothing in the record indicates that Sandra was actively resisting arrest as she sat in the car or that she was attempting to evade arrest by flight. Her principal offense, it would appear, was to disobey the commands to terminate her call to the 911 operator. Whether Zarrett reasonably interpreted her refusal as a realistic threat to his personal safety or

whether it constituted nothing more than an affront to his command authority is a matter for a jury to decide.[4]

A threat to an officer's safety can justify the use of force in cases involving relatively minor crimes and suspects who are not actively resisting arrest or attempting to flee. See, e.g., Lawyer v. City of Council Bluffs, 361 F.3d 1099 (8th Cir. 2004); Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004). In Lawyer v. City of Council Bluffs, two young men were pulled over for speeding in the early morning hours, and the driver refused the officer's orders to get out of his vehicle to sign the speeding citation. 361 F.3d at 1101-02. The officer ultimately placed the driver under arrest, but the driver continued to refuse to exit the vehicle. Id. at 1102. The officer tried to open the door, only to find that it was locked. Id. The driver did not respond to numerous requests to unlock the doors, causing the officer to reach inside the window to unlock the door. Id. The window began to roll up onto the officer's arm, and he sprayed pepper spray inside the car as another officer stepped in to stop the window. Id. We concluded that the officer did not use excessive force in deploying the pepper spray because "it was objectively reasonable for [the officer] to believe that he was in immediate danger, as he faced the possibility that he could be dragged down the road with his arm trapped in the window if the vehicle began to move." Id. at 1105.

_____

[4]We recognize that a late night traffic stop presents certain inherent risks to an officer's safety. Zarrett testified that officers generally park their squad cars behind and closer to the passing traffic than the car in front of them. According to Zarrett, parking this way creates a buffer, fanning the squad cars out from the stopped car. In this case, four squad cars were parked behind Richard's car, with Zarrett's car located the farthest back and to the right of the other cars. The squad cars and their lights presumably alerted motorists to the traffic stop, but it was nonetheless dark outside. There was also road construction in the area, and Richard had pulled the car into the farthest lane on the left, meaning that Zarrett was standing near passing traffic as he confronted Sandra. These facts alone do not justify Zarrett's use of force. Accepting Sandra's version of the facts as true, she was merely sitting quietly with her seat belt fastened, speaking to a 911 operator when Zarrett used summary force against her.

The suspect in <u>Lawyer</u> posed an immediate threat to the officer's safety, and the circumstances were "tense, uncertain, and rapidly evolving." <u>See</u> <u>Graham</u>, 490 U.S. at 397. Taking the facts in the light most favorable to Sandra and judging the situation from the perspective of a reasonable officer on the scene, the same cannot be said in this case.

The facts in <u>Draper v. Reynolds</u>, 369 F.3d 1270 (11th Cir. 2004) are somewhat similar to those in <u>Lawyer</u>, but we disagree with Zarrett's contention that <u>Draper</u> is apposite to the instant case. In <u>Draper</u>, the Eleventh Circuit held that the officer's use of a Taser gun to effectuate an arrest did not constitute excessive force. <u>Id.</u> at 1278. The officer, Reynolds, had stopped a tractor trailer truck at approximately 11:30 p.m. because its tag light was not appropriately illuminated. <u>Id.</u> at 1272. Reynolds instructed the driver, Draper, to meet him behind the truck, a location in view of the police camera. <u>Id.</u> at 1273. The police camera recording showed that Draper "was hostile, belligerent, and uncooperative." <u>Id.</u> at 1273, 1278. Draper paced back and forth behind his truck, yelling at Reynolds, and refused to comply with five commands to retrieve certain documents from his truck. <u>Id.</u> at 1273. Reynolds finally Tasered Draper, and the back-up officer, who had arrived at about the time of the Tasering, handcuffed him. <u>Id.</u> at 1273-74. After Draper was handcuffed, Reynolds stated that he thought Draper was going "to fight me." <u>Id.</u> at 1274.

Both Sandra and Draper were suspected of committing minor, nonviolent crimes, and both were involved in late-night traffic stops, but the factual similarities end there. Sandra was a frightened passenger who had disobeyed two orders to end her phone call with a 911 operator, and four officers were handling the traffic stop. Draper, on the other hand, was behind his truck, pacing, yelling, and swearing at Reynolds, who at the time was the only officer on the scene. Draper posed a realistic threat to Reynolds's safety, but accepting Sandra's version of the facts as true, she posed no similar threat to Zarrett. In light of both the undisputed facts and Sandra's version of the disputed facts in this case, we cannot say that Zarrett's use of force was

reasonable as a matter of law, and we conclude that there is a genuine issue of material fact as to whether Zarrett used excessive force in violation of Sandra's constitutional rights.[5]

B.

Our second inquiry in considering the denial of qualified immunity is whether the right violated was clearly established. Whether the facts alleged support such a claim is a legal question for the court to decide. Kahle v. Leonard, 477 F.3d 544, 549 (8th Cir. 2007). A right is clearly established if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." Hope, 536 U.S. at 739 (quotation omitted). The standard does not require that there be a case with materially or fundamentally similar facts. Brown v. Fortner, 518 F.3d 552, 561 (8th Cir. 2008). "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer

---

[5]The Taser is a relatively new implement of force, and case law related to the Taser is developing. Several of our sister circuits have considered whether the deployment of a Taser during an arrest constitutes excessive force in violation of the Fourth Amendment. See, e.g., Parker v. Gerrish, 547 F.3d 1, 8-11 (1st Cir. 2008) (upholding jury verdict that officer used excessive force in Tasering an arrestee who had insulted the officers but also had complied with their requests and did not resist arrest); Zivojinovich v. Barner, 525 F.3d 1059, 1071-73 (11th Cir. 2008) (per curiam) (use of a Taser to subdue a suspect who had repeatedly ignored police instructions and continued to act belligerently found to be reasonably proportionate to the need for force); Casey v. City of Fed. Heights, 509 F.3d 1278, 1282-87 (10th Cir. 2007) (use of a Taser and related force against a nonviolent misdemeanant who did not flee or actively resist arrest found to be excessive); Draper, 369 F.3d at 1277-78; Russo v. City of Cincinnati, 953 F.2d 1036, 1044-45 (6th Cir. 1992) (genuine issue of material fact raised as to whether the use of a Taser on a potentially homicidal and suicidal individual who was holding a knife in each hand and had made threatening statements to police officers constituted excessive force).

that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202. Accordingly, we must determine whether the facts alleged support a claim of violation of Sandra's clearly established right such that a reasonable officer would have fair warning that his alleged conduct was unlawful. See id.; Howard, 2009 WL 1885495 at *5.

The district court held that "it was unreasonable to, without warning, taser a nonviolent passenger who was not fleeing or resisting arrest and was suspected of a minor, nonviolent crime, because she had disobeyed two orders to get off the telephone with a 9-1-1 operator." D. Ct. Order of Feb. 14, 2008, at 23. Zarrett argues that it is not clearly established that an officer must issue a warning before deploying a Taser, but he reads the district court's holding too narrowly. The clearly established right is not that Sandra was entitled to a warning, but rather that she was entitled to be free from excessive force under the facts and circumstances presented in this case.

The right to be free from excessive force in the context of an arrest is clearly established under the Fourth Amendment's prohibition against unreasonable searches and seizures. Graham, 490 U.S. at 396; Henderson, 439 F.3d at 503; Kukla v. Hulm, 310 F.3d 1046, 1050 (8th Cir. 2002); Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998). Moreover, it is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public. Casey, 509 F.3d at 1278 (citing Graham, 490 U.S. at 396); Kukla, 310 F.3d at 1050 (citing Graham, 490 U.S. at 396); see also Henderson, 439 F.3d at 503. At the time Zarrett deployed his Taser and arrested Sandra, the law was sufficiently clear to inform a reasonable officer that it was unlawful to Taser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator.

We find further support for our holding in the Eighth Amendment context, in which we have held that prisoners have a clearly established right to be free from a Taser shock or its equivalent[6] in the absence of a security threat.  In Hickey v. Reeder, 12 F.3d 754 (8th Cir. 1993), a jail official shot an inmate with a stun gun after the inmate refused to sweep his cell.  Although the inmate posed no immediate threat, the jail officials argued that the need to compel the inmate to sweep the floor after he had been ordered to do so justified the force.  Id. at 759.  A review of Eighth Circuit case law revealed that the use of force was justified when there was a concern for the safety of the institution, the jailers, and the inmates.  Id. (gathering cases).  We noted that "a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless," and held that using a stun gun to ensure compliance with housekeeping regulations is not a constitutionally permissible option.  Id. at 757, 759.  In pepper spray cases, we have held that "[a] basis for an Eighth Amendment claim exists when, as alleged here, an officer uses pepper spray without warning on an inmate who may have questioned his actions but who otherwise poses no threat."  Treats v. Morgan, 308 F.3d 868, 873 (8th Cir. 2002).

## C.

It is the province of the jury to assess the credibility of the evidence, and if the jury accepts Sandra's account, it could fairly conclude that to apply a Taser in the situation here presented would constitute the use of excessive force.  Accepting Sandra's versions of the facts as true, we conclude that she has alleged a violation of her clearly established right to be free from excessive force.  See Littrell, 388 F.3d at 585 (holding that the district court properly submitted the issue of excessive force to the jury, but erred when it submitted the question of whether the officer reasonably believed that his actions were objectively reasonable in light of clearly established

---

[6]Zarrett testified that the Taser and pepper spray are coequals on the use of force continuum and that he believed that the Taser was the better implement of force to gain compliance from Sandra.

law); see also Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1081 (8th Cir. 1990) ("The question for the jury is whether, judging from the perspective of a reasonable officer at the scene of the arrest, the totality of the circumstances justifies the use of the force used."); McIntosh v. Weinburger, 810 F.2d 1411, 1431 n.8 (8th Cir. 1987) ("The court, rather than the trier of fact, is to determine whether the facts alleged support a claim of violation of clearly established law." (internal quotations omitted)) *cert. granted, judgment vacated on other grounds by* Turner v. McIntosh, 487 U.S. 1212 (1988). The district court thus properly denied summary judgment on the basis of qualified immunity.

## III.

Under Minnesota law, official immunity prevents "'a public official charged by law with duties which call for the exercise of his judgment or discretion' from being held personally liable to an individual for damages." Schroeder v. St. Louis County, 708 N.W.2d 497, 505 (Minn. 2006) (quoting Anderson v. Anoka Hennepin Indep. Sch. Dist. 11, 678 N.W.2d 651, 655 (Minn. 2004) and Elwood v. Rice County, 423 N.W.2d 671, 677 (Minn. 1988)). When an official is exercising such discretionary functions, official immunity applies unless a "willful or malicious wrong is committed." Id. In the context of official immunity, "willful" and "malicious" are synonymous, and the Minnesota Supreme Court has defined malice as "nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." Rico v. State, 472 N.W.2d 100, 107 (Minn. 1991) (quoting Carnes v. St. Paul Union Stockyards Co., 205 N.W. 630, 631 (Minn. 1925)). "Whether or not an officer acted maliciously or willfully is usually a question of fact to be resolved by the jury." Johnson v. Morris, 453 N.W.2d 31, 42 (Minn. 1990).

Sandra presented sufficient evidence to preclude summary judgment on the basis of official immunity on the alleged state tort claims. As set forth above, there

is a fact dispute regarding whether Zarrett used excessive force during the Tasering and arrest. Accepting Sandra's account as true, a jury could find that Zarrett is not entitled to official immunity because he wilfully violated her right to be free from excessive force.

## Conclusion

We affirm the district court's order denying summary judgment on the basis of qualified and official immunity.

_____