# United States Court of Appeals

## For the Eighth Circuit

_____

No. 17-1202

_____

Larry Zubrod, Individually and as Administrator for the Estate of Michael Zubrod;
Cheryl Zubrod, Individually and as Administrator of the Estate of Michael Zubrod

*Plaintiffs - Appellants*

v.

Shayne Hoch, In his capacity as a Law Enforcement Officer for the Worth County
Sheriff's Office; Issac Short, In his capacity as a Law Enforcement Officer for the
Worth County Sheriff's Office; John Smith, In his capacity as a Law Enforcement
Officer for the Worth County Sheriff's Office; Jay W. Langenbau, Sheriff, in his
individual capacity; Worth County, Iowa

*Defendants - Appellees*

_____

No. 17-1324

_____

Larry Zubrod, Individually and as Administrator for the Estate of Michael Zubrod;
Cheryl Zubrod, Individually and as Administrator of the Estate of Michael Zubrod

*Plaintiffs - Appellees*

v.

Shayne Hoch, In his capacity as a Law Enforcement Officer for the Worth County
Sheriff's Office; Issac Short, In his capacity as a Law Enforcement Officer for the

Worth County Sheriff's Office; John Smith, In his capacity as a Law Enforcement Officer for the Worth County Sheriff's Office; Jay W. Langenbau, Sheriff, in his individual capacity; Worth County, Iowa

*Defendants - Appellants*

_____

Appeals from United States District Court
for the Northern District of Iowa - Waterloo

_____

Submitted: February 14, 2018
Filed: October 22, 2018

_____

Before SMITH, Chief Judge, MURPHY and COLLOTON, Circuit Judges.[*]

_____

SMITH, Chief Judge.

On the night of September 22, 2013, at around 11:25 p.m., Worth County Deputy Isaac Short responded to a domestic disturbance call in Northwood, Iowa. When he arrived, he found Michael Zubrod ("Michael") brutally attacking his girlfriend, Rhonda Schukei. A protracted struggle involving first Deputy Short and Michael, and eventually Deputies Shayne Hoch and John Smith, ended in Michael's death. Larry and Cheryl Zubrod (the "Zubrods"), Michael's parents, brought claims under state and federal law against Deputies Short, Hoch, and Smith; Worth County Sheriff Jay W. Langenbau; and Worth County, Iowa (collectively, "defendants"), alleging that the deputies' actions violated Michael's constitutional rights. The

_____

[*]Chief Judge Smith and Judge Colloton file this opinion pursuant to 8th Cir. Rule 47E.

-2-

district court[1] entered summary judgment in favor of the defendants on the federal claims and declined to exercise supplemental jurisdiction over the state-law claims. The Zubrods appeal the district court's grant of summary judgment in favor of the defendants. The defendants cross-appeal the district court's decision not to exercise jurisdiction over the state-law claims. We affirm.

I. *Background*

We view the facts in the light most favorable to the Zubrods. *See Capps v. Olson*, 780 F.3d 879 (8th Cir. 2015).

During his September 22, 2013 patrol, Deputy Short informed dispatch that residents in the Northwood, Iowa area told him that they heard screams from a house that belonged to Rhonda Schukei. He arrived, entered the two-story house, and drew his gun. Once inside, he heard a woman's screams coming from a bedroom on the second story. He approached the bedroom door, found that it was locked, and kicked it open.

Deputy Short found Michael standing over Schukei. Deputy Short saw Michael strike her in the face with a hammer. Michael was bloody and yelling, "[D]ie bitch, you're gonna die!" *Zubrod v. Hoch*, 232 F. Supp. 3d 1076, 1081 (N.D. Iowa 2017). Deputy Short radioed a request for all available law enforcement to come to the scene.

Deputy Short drew his firearm and ordered Michael to step away from the victim. Michael initially complied, stepping away from Schukei and dropping the hammer. However, when Deputy Short holstered his handgun and took out his taser, Michael said something about finding a gun and began to reach down under the bed.

---

[1]The Honorable C.J. Williams, United States Magistrate Judge for the Northern District of Iowa, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

He came back up empty-handed, then reached over to the headboard and grabbed a pair of scissors. He then stabbed Schukei in the neck while she was on the floor, leaving the scissors protruding from her neck. Deputy Short fired his taser at Michael, but it did not cause neuromuscular incapacitation.[2] Deputy Short pulled the cartridge from the taser in an attempt to use it in drive-stun mode.[3] Michael then grabbed a pair of needle-nose pliers from a dresser and approached Deputy Short. The two began to fight. Deputy Short dropped his taser during the struggle.

The fight moved from the bedroom in which Schukei was located, to the hallway, and into another bedroom. Deputy Short was eventually able to force Michael on his back, hold his wrists, place a knee on Michael's chest, and secure a handcuff to Michael's left wrist. Michael continued to resist, however, and Deputy Short was unable to secure the handcuffs to Michael's other wrist. This was a potentially dangerous situation, as handcuffs secured on only one wrist can be used as a weapon. Deputy Short radioed dispatch during the struggle that there was a lot of blood and that one person was down. Deputy Short successfully, but with much difficulty, held Michael's wrists for about eight minutes, until Deputy Hoch arrived.

When Deputy Hoch arrived, he went to the bedroom in which Deputy Short and Michael were struggling. Deputy Hoch ordered Michael to turn over onto his stomach and put his hands behind his back so he could be handcuffed. Deputy Short

---

[2]Neuromuscular incapacitation occurs "only if both barbs make contact with the body." *Id.* The taser can also be activated by "placing the barrel of the [t]aser directly against the suspect's body," resulting in a "burning sensation, as opposed to neuromuscular incapacitation." *Id.* at 1084. This is known as "drive-stun mode." *Id.* at 1084. Drive-stun mode "is used as a method of pain compliance." *Id.* But if "the barbs [are] still attached" to the body of a person against whom a taser is deployed in drive-stun mode, the taser is "effectively used in a hybrid mode that could, in theory, cause neuromuscular incapacitation." *Id.*

[3] The parties dispute whether he succeeded.

released Michael so he could comply. But instead of turning over, Michael broke free and got to his feet. Deputy Hoch deployed his taser, but it was again ineffective. The fight continued, with the two deputies trying to physically bring Michael under control. During this phase of the fight, Deputy Hoch was pushed into a window.

Deputy Smith arrived a few minutes after Deputy Hoch. At this point, Deputy Short and Deputy Hoch had Michael on his back on a pile of clothes. He was still actively resisting, "kicking out and flailing one arm with a handcuff attached to it." *Id.* at 1083. Deputy Hoch directed Deputy Smith to use his taser on Michael. After Deputy Smith pulled out his taser and prepared to shoot it, Deputy Short and Deputy Hoch released their grip on Michael, who again broke away, getting to his feet and moving to a window. Deputy Smith attempted to deploy his taser, but it malfunctioned, and he dropped it.

The deputies again attempted to physically restrain Michael. Deputy Hoch loaded another taser cartridge and shot Michael in the thigh with his taser. Though the barbs connected with Michael's skin, neuromuscular incapacitation did not result. The struggle continued, with all three deputies trying to wrangle Zubrod.

Deputy Hoch attempted to drive-stun Zubrod. However, as the barbs remained attached to Michael, this attempt failed. Instead, Deputy Hoch "effectively used [the taser] in a hybrid mode that could, in theory, cause neuromuscular incapacitation." *Id.* at 1084. After multiple taser pulls, Michael was handcuffed. Taser records showed that during a period of 3 minutes and 15 seconds, Deputy Hoch pulled his trigger 10 times for a total of 53 seconds. Though it is not known how many times the taser made contact with Michael, it is undisputed that Michael was never neuromuscularly incapacitated.

After finally handcuffing Michael, the deputies noticed he was not breathing. Paramedics who were already on the scene commenced CPR, and a request for

another ambulance was made at 12:09 a.m. Michael was pronounced dead at 1:17 a.m. The medical examiner stated the cause of death was "cardiac arrhythmia following altercation with police in the setting of acute methamphetamine intoxication" and concluded that the taser's role in Michael' s death was "unknown." *Id.* at 1085. The examiner found two sets of taser burns and three taser barbs (two in the thigh and one on the arm) on Michael's body. The examiner also noted marks on the left side of Michael's chest and opined that it was possible but unlikely that they were caused by a taser. He also found a barb in Michael's belt; however, it did not seem to have punctured his jeans, underwear, or skin.

Methamphetamine, methamphetamine metabolite, and naloxone were found in Michael's blood. According to the evidence, Michael was a user of methamphetamine, and he had increased his use of the drug in the days leading up to his attack on Schukei.

The Zubrods, Michael's parents and the administrators of his estate, filed a seven-count lawsuit against Deputies Short, Hoch, and Smith, in their individual capacities, Worth County Sheriff Jay Langenbrau, in his individual capacity, and Worth County. Counts I and II are 42 U.S.C. § 1983 claims against Deputy Hoch and allege that the taser pulls violated Michael's Fourth Amendment right not to be subjected to excessive force. Count I is based on the first group of tasings during the struggle. Count II alleges that Michael was tased while he was "restrained with handcuffs and otherwise posed no reasonable risk of harm or safety to any officer or other individuals." *Id.* at 1079 (quoting Doc. 2 at 8). Count III is also brought under § 1983 and alleges that Deputies Short and Smith violated Michael's Fourth Amendment rights by failing to intervene when Deputy Hoch used excessive force against him. Counts IV is a state-law claim of assault and battery against Deputy Hoch. Count V is a state-law claim of negligence against the deputies. Count VI alleges vicarious liability against Worth County and Sheriff Langenbrau. Count VII alleges loss of consortium against all the defendants.

The defendants moved for summary judgment, arguing that the deputies were entitled to qualified immunity because, under the circumstances, taser use was reasonable. And, even if tasing Michael violated his constitutional rights, such rights were not clearly established at the time of the encounter. The district court granted the motion.

The court reviewed the submitted evidence, including the deputies' depositions and that of Schukei, the affidavit of first responder Dennis Paulson,[4] the taser logs, and videos from Deputies Smith's and Hoch's tasers. The video from Deputy Smith's taser was only a few seconds long and revealed that the taser malfunctioned. The video from Deputy Hoch's taser captured the last moments of the struggle. The Zubrods also offered two unsworn statements provided by emergency medical personnel who arrived on the scene.

The court stated that the encounter presented "a fluid and continuous resistance by Zubrod to any efforts to place him under arrest." *Id.* at 1091. The court could not identify a "bright line during this intense struggle, while a woman lay severely wounded in another room, where any reasonable officer should have concluded that the nature of Zubrod's resistance had changed in such a material respect that the use of a taser to obtain compliance was suddenly constitutionally prohibited." *Id.* at 1091–92.

The court also determined that the Zubrods' assertion that Deputy Hoch tased Michael after he was handcuffed was not supported by the record. According to the court, even when viewed in the light most favorable to the Zubrods, a juror viewing the Hoch taser video as proof that Michael was handcuffed would be resorting to "pure speculation." *Id.* at 1092. Additionally, it determined that the first responder

---

[4]Paulson was on the scene in his capacity as a volunteer firefighter, but he was also a Worth County deputy at the time of the incident.

statements offered by the Zubrods in support of this theory require unreasonable inferences and speculation and were inadmissible. Further, the court concluded that even if there had been a constitutional violation, it was not of a clearly established right.

The court held that its rulings on Counts I and II foreclosed failure-to-intervene claims against Deputies Short and Smith, since "logic dictates that Deputies Short and Smith cannot be held liable for failing to intervene where no constitutional violation occurred." *Id.* at 1098 (citing *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 991 (8th Cir. 2015)). Accordingly, it granted summary judgment on that claim as well. The court dismissed the Zubrods' vicarious liability claims against Sheriff Langenbau and Worth County due to the lack of a constitutional violation and the lack of any allegation of wrongdoing against those defendants. The court also dismissed the loss-of-consortium claims to the extent they were based on the federal claims. After dismissing all the federal claims, the court opted not to exercise supplemental jurisdiction over the remaining state-law claims. The court thus dismissed them without prejudice.

The Zubrods timely appeal. The defendants cross-appeal the district court's decision to decline jurisdiction over the state-law claims.

## II. *Discussion*

The Zubrods' central claim is that the district court erred in granting summary judgment because the material fact question of whether the deputies tased Michael while he was handcuffed remains in dispute. To establish the existence of the alleged disputed fact, they primarily rely on two unsworn statements from on-scene paramedics. The paramedics claimed that they heard a taser being discharged while Deputy Short escorted them upstairs. The Zubrods contend that Deputy Short's absence from the room where the fight was taking place implies that the situation had been brought under control. Accordingly, in their view, any tasing at that point would

-8-

have been an excessive use of force. The Zubrods argue that the district court erred in excluding these statements and that, if considered, they would create a genuine dispute of material fact. The Zubrods also allege that an additional material fact question remains—whether Deputy Hoch repeatedly tased Zubrod without permitting him time to comply.

Additionally, the Zubrods assert that taser video evidence shows that Michael called out for a doctor during some point while he was being tased. They also claim that there are inconsistencies in the deputies' testimony on certain factual issues. These include: (1) whether Michael pushed Deputy Hoch into a window, causing it to break; (2) whether Michael was seated or standing when he swung a curtain rod; and (3) where the deputies were positioned as they tried to restrain Michael. The Zubrods state that when viewed in the light most favorable to them, these facts render the deputies' use of force unreasonable.

The defendants respond that the paramedics' statements were properly excluded, but that even if considered, they do not create a genuine dispute of material fact due to the conclusive nature of the record evidence, namely the taser videos.

A. *Unsworn Statements*

We first resolve whether the district court improperly disregarded the two unsworn paramedic statements submitted by the Zubrods. These statements were obtained by state investigators in the immediate aftermath of the shooting. The Zubrods contend that the statements show that the deputies tased Michael even after he had been subdued. The district court summarized the Zubrods' position on the factual import of these statements as follows:

> Plaintiffs also rely on two, unsworn statements by paramedics who claim Deputy Short escorted them upstairs, and while climbing the stairs, they heard a Taser deployed. Plaintiffs combine these statements with Deputy

Short's testimony that law enforcement officers generally do not want medical personnel present until a suspect is under control, and his testimony that he did not leave the upstairs until Zubrod was in handcuffs, to argue that Deputy Hoch must have Tasered Zubrod after Zubrod was handcuffed.

*Id.* at 1092–93. The district court expressed skepticism that the statements, even if considered, created a genuine issue of material fact. However, we need not address their probative value, as we agree with the district court that our precedent compels the statements' exclusion.

In *Banks v. Deere*, the plaintiff in an employment discrimination case submitted three unsworn statements from coworkers in opposition to a motion for summary judgment. 829 F.3d 661, 667 (8th Cir. 2016). We interpreted Federal Rule of Civil Procedure 56(c) and 28 U.S.C. § 1746 as prohibiting a court's consideration of an unsworn statement or declaration when deciding a motion for summary judgment unless it is signed, dated, and certified as true and correct under penalty of perjury. *Id.* at 667–68. Having reviewed the record, none of the handwritten first responder statements submitted by the Zubrods meet this standard. Further, the Zubrods have "not explained why [they] could not have obtained sworn affidavits, written declarations 'under penalty of perjury,' or other competent evidence from [their] proposed witnesses." *Id.* at 668 (citing Fed. R. Civ. P. 56(d)). Therefore, the district court properly disregarded these statements.

We are not persuaded by the Zubrods' argument that Iowa Code § 718.6 renders the first responders' statements made impliedly under penalty of perjury. Section 718.6 criminalizes giving a false statement to law enforcement, and these statements were submitted to state criminal investigators. However, the force of an attestation does not spring from the mere fact that being untruthful has consequences; rather, a substantial amount of its value is that it is an affirmation, which is made at the time that the declarant is contemplating making a factual claim. The declarant is

*aware* of the consequences of being untruthful, and he chooses to make the statement anyway. Additionally, a violation of § 718.6 is, at worst, a serious misdemeanor under Iowa law, punishable by no more than a year in prison and a fine of $1,875. Iowa Code § 903.1(b). Perjury is a class D felony under Iowa law, and it is punishable by up to five years' imprisonment and a fine of up to $7,500. Iowa Code §§ 720.2 & 902.9(1)(e). The federal perjury statute also allows a sentence of up to five years' imprisonment and a fine of up to $250,000. 18 U.S.C. §§ 1621, 3571(b), & 3581(b). Moreover, unlike making a false report, both state and federal perjury statutes require that the false statement be made under oath. Iowa Code § 720.2; 18 U.S.C. § 1621. We therefore decline to allow Iowa's false statement statute to implicitly swear a declarant making a statement to law enforcement. Accordingly, the district court did not err in disregarding the unsworn statements.

## B. *Excessive Force and Failure to Intervene*

In an appeal of the grant of summary judgment based on qualified immunity,

> [w]e apply de novo review to the district court's grant of summary judgment to the defendants, viewing the evidence in the light most favorable to [the plaintiffs] and drawing all reasonable inferences in [their] favor. A district court appropriately grants summary judgment to the movant if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. An official is entitled to qualified immunity unless (1) the evidence, viewed in the light most favorable to the plaintiff, establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation.

*Malone v. Hinman*, 847 F.3d 949, 952–53 (8th Cir.), *cert. denied*, 138 S. Ct. 222 (2017) (cleaned up). A genuine dispute arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation. We must consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest. The use of deadly force is reasonable where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others. We judge the reasonableness of [an officer's] use of force from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

*Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012) (cleaned up).

The Zubrods argue that Deputies Short, Hoch, and Smith were not entitled to qualified immunity. Their primary argument is that there is a genuine dispute of material fact whether Michael posed such serious danger to others so as to justify Deputy Hoch's taser pulls. They contend that Michael was physically and mentally drained, confused, and under control, and that tasing him as long as Deputy Hoch did was therefore objectively unreasonable.

The Zubrods point to several facts that would make the number of taser pulls unreasonable. They claim that Michael was not attacking the deputies or even trying to stand up. They assert the video proves that Michael was disoriented, exhausted, and unable to understand the deputies' orders or physically comply with them. They also focus on the number of deputies and their sizes. Deputies Smith and Hoch were comparable to Michael's size. And though Deputy Short weighed substantially less than Michael, the Zubrods view his fight with Michael as proof that his size did not disadvantage him.

The Zubrods also claim that the video leaves unclear whether Michael was on his back or his stomach, and that if he was on his stomach, Deputy Hoch's repeated tasing was unreasonable, as it prevented Deputies Smith and Short from putting Michael's hands behind his back and cuffing him. They further assert that Deputy Hoch's use of his taser was unreasonable because it kept him from being able to use both hands to subdue Michael, especially since a smaller deputy, Deputy Short, had previously gained some manner of physical control over Michael by himself. Additionally, the Zubrods contend that Deputy Hoch had time to discern if Michael was going to comply. For support, they cite *Moore v. City of Ferguson*, 213 F. Supp. 3d 1138 (E.D. Mo. 2016), for the proposition that the short gaps between bursts of tasing create a fact question regarding whether Zubrod was given the chance to comply. They further imply that the absence of a complete video from Deputy Smith's taser should create some inference in their favor.

The Zubrods contend that the district court overlooked or minimized several disputed facts material to the issues. For instance, they suggest the possibility that Michael was crying out for a doctor; that the bedroom window was not broken by Deputy Hoch's bumping into it; and that Michael was seated, not standing, when he had the curtain rod. They also claim some contradictions exist in the deputies' accounts of who restrained which portion of Michael's body during the struggle.

The defendants counter that the evidence—primarily the deputies' statements, the statement of first responder Paulson, and Deputy Hoch's taser video—demonstrates that Michael was a threat for essentially the entirety of the encounter and was only brought under control after the allegedly unconstitutional tasings. They emphasize that (1) a handcuff was secured to Michael's left wrist, but not his right; (2) Michael was on his back, actively resisting, for most of the end of the confrontation; and (3) no evidence shows Michael ever turned onto his stomach despite multiple attempts by the deputies to make him do so. According to the defendants, the deputies ceased tasings after they got enough control over Michael

to get him handcuffed. The defendants also dispute the Zubrods' representation of the factual record.

Factors relevant to whether an officer's use of force was objectively reasonable are

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The Zubrods argue that Michael was tased even after a reasonable officer on the scene would have known that he was no longer a threat. Viewing the record in the light most favorable to the Zubrods, we find no genuine dispute of material fact that Michael posed a threat to the safety of the deputies and the assault victim until subdued and handcuffed.

Though we view the facts in the light most favorable to the nonmoving party, the Zubrods have not submitted competent, admissible evidence that rebuts the deputies' version of events. *See, e.g.*, *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001) ("We conclude that summary judgment was appropriate in this case because [the shooting officer's] use of force, as he describes it, was within the bounds of the Fourth Amendment, and all of the evidence presented to the district court is consistent with that account. The plaintiffs may not stave off summary judgment armed with only the hope that the jury might disbelieve witnesses' testimony." (cleaned up)). The deputies' statements were substantially the same regarding the

material facts: Michael had already severely injured his victim and demonstrated hostility and violence toward the deputies. The deputies faced an individual who was dangerous, acting abnormally, strong, threatening, and noncompliant, and each time they eased up to allow him to submit, he resumed his violent behavior. With the unsworn statements excluded, the Zubrods rely on Deputy Hoch's taser video. After reviewing it, we conclude that it shows a violent suspect who failed to comply with reasonable orders to turn around and resisted even after multiple tasings. This is consistent with the deputies' statements. The video does not provide any evidence that would lead a reasonable juror to conclude that Michael surrendered.

Deputy Hoch's taser log recorded a five-second tasing at 11:47:35, a five-second tasing at 11:48:39 , a five-second tasing at 11:48:47, a five-second tasing at 11:48:53, a seven-second tasing at 11:50:05, a six-second tasing at 11:50:12, and a five-second tasing at 11:50:28. The video also appears to depict one or two more tasings after this. The gaps between the first three tasings and the fifth and sixth tasings are therefore somewhere between approximately zero and three seconds. However, over a minute elapses between the fourth and fifth deployments of the taser, and there are ten seconds between the penultimate and final deployments.

The Zubrods rely on *Moore* for the proposition that short gaps between tasings creates a fact question as to whether an officer allowed sufficient time for a suspect to comply with the officer's commands. In that case, the suspect ran naked down the street yelling that he was Jesus. 213 F. Supp. 3d. at 1141. An officer encountered the suspect and commanded him to go to the ground. *Id.* at 1142. The suspect instead approached the officer aggressively. *Id.* The officer tased him in barb mode, and when the suspect made a move to get to his feet, the officer tased him again. *Id.* The officer tased the suspect one to two more times, and the taser logs indicated that the tasings were separated by fewer than two seconds. *Id.* The suspect subsequently died. *Id.* at 1143. The district court held that this created a genuine dispute of material fact as to

whether the officer gave the suspect enough time to comply with the officer's commands. *Id.* at 1144–45.

*Moore* is a district court case that is not controlling law for this court. Furthermore, the facts here are distinguishable. The basis of the instant case is not a brief encounter with an oddly-acting suspect who posed no obvious danger, as in *Moore*. To the contrary, Michael's confrontation with police began with Deputy Short's intervention into what could have ended with a woman's death. The deputy's announced presence did not dissuade Michael from continuing his assault. His belligerence continued, and he fought first one, then two, then three deputies who were unable to obtain his compliance without the use of tasers. There is no genuine fact dispute that, prior to his eventual cuffing, the tasing attempts failed to incapacitate Michael. Under the aforementioned "tense, uncertain, and rapidly evolving" circumstances, this does not present a constitutional violation. *Graham*, 490 U.S. at 397.

Other taser cases cited by the Zubrods are also distinguishable. Specifically, *Shekleton v. Eichenberger* involved the tasing of an "unarmed suspected misdemeanant, who did not resist arrest, did not threaten the officer, did not attempt to run from him, and did not behave aggressively towards him." 677 F.3d 361, 366 (8th Cir. 2012). *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009), involved similar circumstances. There, the plaintiff was tased even though the basis of her encounter with police was a minor, nonviolent offense, she posed "at most a minimal safety threat" to officer safety, *id.* at 496, and she was "not actively resisting arrest or attempting to flee." *Id.* at 497. Further, the situation was not "tense, uncertain, and rapidly evolving" and did not necessitate the making of any split-second decisions. *Id.* (quoting *Graham*, 490 U.S. at 397).[5]

---

[5]The authorities the Zubrods cite from other circuits are also unavailing. *See Mattos v. Agarano*, 661 F.3d 433, 446, 450 (9th Cir. 2011) (en banc) (holding, in

-16-

In contrast, several cases in our circuit support the district court's conclusion that the factual record did not show a violation of Michael Zubrod's constitutional rights.

*De Boise v. Taser Int'l, Inc.*, 760 F.3d 892 (8th Cir. 2014), is instructive. In that case, officers responded to the home of a mentally disturbed man, Samuel De Boise, after receiving a report. *Id.* at 894. De Boise had spent much of the day walking around naked and referring to himself as God, and he had physically harmed and frightened his mother, who lived at the same residence. *Id.* De Boise's mother told police that there was a gun in the house. *Id.* at 895.

De Boise exited the house shortly after the arrival of the first officer, but he suddenly went back inside. *Id.* at 894–95. Five more officers then arrived. *Id.* at 895. Officer Joseph Percich heard yelling, glass breaking, and other loud noises coming from inside the house. *Id.* When De Boise came outside again—as before, naked and

---

consolidated appeal, that force was excessive where one plaintiff was a non-dangerous pregnant woman who was tased after refusing to sign a speeding ticket and resisting arrest for that refusal and the other was the non-threatening victim of a domestic dispute that had seemingly concluded by the time the police arrived); *Oliver v. Fiorino*, 586 F.3d 898, 901 (11th Cir. 2009) (arrestee "was neither accused nor suspected of a crime at the time of the incident, . . . [was] tasered . . . as many as eleven or twelve times," officers did not try to handcuff him between tasings, and tasings continued even after he was apparently incapacitated, leading to his death); *Landis v. Baker*, 297 F. App'x 453, 456–58 (6th Cir. 2008) (though plaintiff had employed violence against the officers, that encounter began due to a minor violation of the law, and at the time of the tasings, the plaintiff had been subdued and his face was in swamp water). The cases collected in *Cockrell v. City of Cincinnati* merely support the proposition that excessive tasing cases generally involved either "plaintiffs tased while actively resisting arrest by physically struggling with, threatening, or disobeying officers," or "a law-enforcement official tases a plaintiff who has done nothing to resist arrest or is already detained." 468 F. App'x 491, 495, 496 (6th Cir. 2012).

claiming to be God—Officer Percich pointed his taser at De Boise. *Id.* Another officer ordered De Boise to get face down on the ground. *Id.* After he complied, Officer Percich holstered his taser and approached De Boise so he could handcuff him. *Id.* De Boise then sprang to his feet, clenched his fists, and began glaring in Officer Percich's direction. *Id.* De Boise ignored multiple commands to get to the ground and was tased in neuromuscular incapacitation mode. *Id.* He fell to the ground after five seconds of tasing. *Id.* However, he continued to struggle, and was subjected to eight more taser discharges. *Id.*[6] But De Boise never submitted. *Id.* After the last barb-mode tasing, the officers tased De Boise in drive-stun mode and held him down while emergency medical personnel sedated him. *Id.* at 895–96. Shortly thereafter, he went into cardiac arrest and died. *Id.* at 896.

De Boise's estate filed a § 1983 action. *Id.* The district court determined that the officers were entitled to qualified immunity. *Id.* We affirmed, holding that De Boise's "aggressively approaching one of the officers, his continued noncompliance with the officers' instructions to lie on the ground, and his violent and aggressive behavior, which included kicking and swinging his arms at the officers once they approached to subdue him" created a situation in which "no reasonable officer . . . would have understood the actions taken to be so disproportionate and unnecessary as to amount to a violation of De Boise's rights." *Id.* at 897–98.[7]

_____

[6]One discharge appeared to the officers to have been ineffective.

[7]Recent circuit precedent also supports our conclusion. *See, e.g.*, *Cravender v. Shuster*, 885 F.3d 1135, 1139 (8th Cir. 2018) (holding officer who tased erratically acting man five times in drive-stun mode after he repeatedly refused to comply with order to submit was entitled to qualified immunity); *Brossart v. Janke*, 859 F.3d 616, 621–22 (8th Cir. 2017) (affirming grant of qualified immunity for officers who repeatedly tased in barb mode a farmer who refused to cooperate in an investigation concerning a neighbor's property and threatened law enforcement officials); *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012) (affirming grant of qualified immunity where arrestee was tased after failing to offer hands to officers as ordered

The facts allegedly disregarded by the district court are not material. The Zubrods are correct that Deputy Hoch's decision to employ his taser left him with only one fighting hand. However, courts are to judge the officers' actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Brown*, 574 F.3d at 496 (quoting *Graham*, 490 U.S. at 396). We are therefore hesitant to scrutinize this particular tactical decision. Nonetheless, given the nature of the fight between Michael and the deputies, Deputy Hoch's action was not objectively unreasonable.

Additionally, the possibility that Michael called out for medical attention while being tased does not create a genuine dispute of material fact. Though it is far from clear on the video, we agree with the Zubrods that a reasonable juror could find that Michael yelled "Doctor!" while on the ground. But Michael's violent, continued refusal to comply makes his plea immaterial. And even if they heard him, disbelieving Michael's claim of medical distress would not have been unreasonable. *See Royster v. Nichols*, 698 F.3d 681, 691–692 (8th Cir. 2012) (declining, where arrestee informed officer that he had medical injury that would be aggravated by having hands placed behind back, but there was no other indication of his condition, to hold force used was excessive).

Whether there was glass on the floor, whether Michael was standing or seated on the floor while wielding the curtain rod, and the positions of the deputies during various points of the fight similarly do not alter the state of the material facts. The admissible evidence demonstrates that Michael was a threat from the time Deputy Short entered the residence until he was turned around for handcuffing. The facts upon which the Zubrods rely are either immaterial or not in genuine dispute and do not change the conclusion that the deputies are entitled to qualified immunity.

---

and resisting).

The Zubrods failed to raise a genuine, material fact question as to whether the Deputy Hoch's use of force was reasonable. Because we are satisfied that there was no constitutional violation, we need not undertake an analysis into whether the right in question was clearly established. *See Kulkay v. Roy*, 847 F.3d 637, 642 (8th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Accordingly, we hold that the district court properly granted summary judgment to Deputy Hoch on the Zubrods' excessive force claims (Counts I and II). In addition, because a failure-to-intervene claim may not prevail in the absence of a showing of excessive force, we also hold that the district court properly granted summary judgment to Deputies Short and Smith on the Zubrods' failure-to-intervene claim ("Count III"). *See Hicks v. Norwood*, 640 F.3d 839, 843 (8th Cir. 2011) ("[O]ur holding that Captain Norwood did not use excessive force is fatal to Hicks's claims that the remaining defendants unconstitutionally failed to intervene."). We affirm the district court's grant of summary judgment to the defendants on the Zubrods' federal claims.

## C. *State-Law Claims*

On cross-appeal, the defendants contend that the district court erred by failing to exercise supplemental jurisdiction over the state law claims. A "district court [that] has dismissed all claims over which it has original jurisdiction" "may decline to exercise supplemental jurisdiction." 28 U.S.C. § 1367(c)(3). We review such a decision for an abuse of discretion. *Williams v. Hobbs*, 658 F.3d 842, 852–53 (8th Cir. 2011) (citation omitted). We consider "judicial economy, convenience, fairness, and comity" when making this inquiry. *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 350 n.7.

The district court noted that all the federal claims had been dismissed and that, under 28 U.S.C. § 1367(c)(3), it had the discretion to dismiss the state-law claims. The defendants "point[] to no factor that distinguishes this case from the usual case. Therefore, the balance of the factors indicates that [the Zubrods'] . . . claim[s] properly belong[] in state court." *Wilson v. Miller*, 821 F.3d 963, 971 (8th Cir. 2016) (citing *Cohill*, 484 U.S. at 350)).

III. *Conclusion*

We affirm.

———————————————