# United States Court of Appeals

## For the Eighth Circuit

———————————————

No. 21-3310

———————————————

Hannah Jesski, as Executrix and Personal Representative of the estate of
Dixie Blazier; Glenda Mundis; Robert Mundis

*Plaintiffs - Appellants*

v.

Dakota, Minnesota & Eastern Railroad Corporation

*Defendant - Appellee*

Canadian Pacific (U.S.), Inc.

*Defendant*

————————

Appeal from United States District Court
for the Northern District of Iowa

————————

Submitted: June 14, 2022
Filed: August 8, 2022

————————

Before GRUENDER, BENTON, and GRASZ, Circuit Judges.

————————

GRASZ, Circuit Judge.

James and Dixie Blazier were killed and Glenda Mundis was injured when a
locomotive owned by Dakota, Minnesota & Eastern Railroad Corporation

("DM&E") collided with their SUV at a railroad crossing. The personal representative of Dixie Blazier's estate along with Mundis and Mundis's husband (collectively, "Appellants") sued DM&E for negligence. The district court[1] granted summary judgment in favor of DM&E. We affirm.

## I. Background

James Blazier was driving his SUV northbound toward a railroad crossing in Nora Springs, Iowa, with his wife, Dixie, in the front passenger seat and his sister-in-law, Glenda Mundis, in a rear seat. It was a clear day with good visibility. South of the railroad crossing was a warning sign, white pavement markings, a railroad crossbuck sign, a white stop line, and two sets of flashing lights all visible to a driver headed toward the tracks.

As the Blaziers' SUV approached the crossing, DM&E's locomotive, which was not pulling any train cars, approached the crossing from the east at a speed of 22.1 miles per hour. An engineer ("Mr. E") and a conductor ("Mr. C") were operating the locomotive. Mr. E engaged the locomotive's warning bells and horns twenty-seven seconds before the locomotive reached the crossing. DM&E admits the train crew had a clear line of sight to the Blaziers' SUV when the locomotive was about 308 feet from the crossing and the SUV was about 735 feet from the crossing—almost ten seconds before the collision. Mr. E estimated he first saw the SUV about that same time. Approximately five seconds before impact, Mr. E's view of the Blaziers' SUV was obstructed by the locomotive's control stand for a few seconds.

Mr. C estimated he first saw the Blaziers' SUV when it was 250–300 feet from the crossing and that he saw it swerving soon thereafter. Mr. C also testified that he told Mr. E to stop the locomotive after he saw the SUV swerving. Mr. E

_____

[1]The Honorable C.J. Williams, United States District Judge for the Northern District of Iowa.

-2-

engaged the emergency brakes, though the parties dispute whether he initiated the brakes immediately before or after the collision. The Blaziers' SUV continued toward the crossing and the right-front side of the SUV collided with the left side of the locomotive.

The Blaziers died from the collision, and Mundis sustained severe injuries. After the accident, it was discovered that one headlight and one ditch light on the locomotive were not working. DM&E suggests the lights were working before the collision based on the crew's testimony and inspection reports from earlier that day.

Appellants sued DM&E, alleging eighteen theories of negligence by and through DM&E's agents and employees under Iowa law. DM&E moved for summary judgment, arguing Appellants' theories of negligence were all either meritless or preempted by federal law. The district court granted DM&E's motion for summary judgment, and Appellants appeal.

## II. Analysis

"We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party." *Minnesota ex rel. Northern Pac. Ctr., Inc. v. BNSF Ry. Co.*, 686 F.3d 567, 571 (8th Cir. 2012). Summary judgment is proper when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute arises 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Zubrod v. Hoch*, 907 F.3d 568, 575 (8th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Appellants argue the district court erred in granting summary judgment to DM&E with respect to two of Appellants' theories of negligence: failure to keep a proper lookout and excessive speed. We analyze each in turn.

## A. Failure to Keep a Proper Lookout

Appellants assert DM&E's locomotive crew negligently failed to keep a proper lookout. They argue there are genuine disputes of material fact and that a reasonable jury could determine Mr. E and Mr. C were negligent by being inattentive and by doing nothing to avoid the collision after seeing the Blaziers' SUV's swerving and taking an "unwavering approach towards the crossing." Appellants further argue DM&E was negligent by failing to properly train Mr. E and Mr. C to keep a proper lookout.

The elements of a claim of negligence in Iowa are: "(1) existence of a duty, (2) breach of that duty, (3) causation, and (4) damages." *Vossoughi v. Polaschek*, 859 N.W.2d 643, 654 n.6 (Iowa 2015). The district court held that Appellants failed to present sufficient evidence of causation because they failed to show Mr. E and Mr. C could have recognized the imminent danger of the Blaziers' SUV in time to avoid the collision even had they kept a proper lookout. We agree.

The parties agree the DM&E crew could have avoided the collision by applying the locomotive's brakes about 3.9 seconds before the collision when the locomotive was about 125 feet from the crossing. Appellants argue the Blaziers' SUV's swerving before that time would have led a reasonable person to engage the brakes of the locomotive to avoid the collision. However, expert testimony—including Appellants' expert—established a locomotive operator would require 1.5 seconds of reaction time after perceiving a danger to apply the brakes. Appellants do not offer any evidence disputing the 1.5-second reaction time. Thus, for Mr. E and Mr. C to avoid the collision, they needed to observe the danger the Blaziers' SUV presented at least 5.4 seconds before the collision (3.9 seconds of brake time plus 1.5 seconds of reaction time).

At 5.4 seconds before the collision, the Blaziers' SUV was 404 feet away from the intersection traveling at 52 miles per hour, and neither Mr. E nor Mr. C had seen it swerve. At that point, the Blaziers' SUV's "unwavering approach" was the only

conduct supported by evidence in the record from which Mr. E and Mr. C could have evaluated the risk of danger posed by the Blaziers' SUV. But based on expert testimony, the Blaziers' SUV could have stopped in as little as 111 feet, meaning that at 5.4 seconds before the collision, the Blaziers' SUV had over three times the amount of space necessary to stop before the tracks. At that time, Mr. E and Mr. C had the right to assume the Blaziers' SUV would indeed stop. *See Williams v. Mason City & Fort Dodge Ry. Co.*, 214 N.W. 692, 695 (Iowa 1927) ("Travelers in motor vehicles frequently and customarily drive toward an oncoming train and stop just before going upon the tracks . . . . There is in such conduct, however, no 'peril' until such wayfarer fails to stop in a zone of safety."); *Garcia v. Iowa Interstate R.R., Ltd.*, 829 N.W.2d 589, 2013 WL 988635, at *6–7 (Iowa Ct. App. Mar. 13, 2013) (unpublished table decision) (holding the plaintiff failed to show the defendant's engineer did not keep a proper lookout because the engineer was entitled to assume an approaching vehicle would stop before the tracks and the engineer applied the brakes as soon as he realized the vehicle might not stop); *accord Shibley v. St. Louis–S.F. Ry. Co.*, 533 F.2d 1057, 1061 (8th Cir. 1976) (noting under Arkansas law, "a member of a train crew keeping a lookout has the right to assume that an approaching motorist will stop instead of place [herself] in a position of peril in the path of a moving train" (alteration in original)).

Indeed, Appellants' own expert testified the DM&E crew should have recognized the need to brake when the Blaziers' SUV was within approximately 200–300 feet from the crossing. But this was too late: at 5.4 seconds before the collision, the Blaziers' SUV was 404 feet away from the crossing.

Appellants argue that if Mr. C had been closely watching the crossing prior to 5.4 seconds before the collision, he could have seen the danger the Blaziers' SUV presented and avoided the collision. But Appellants can only speculate that at that time Mr. C would have seen the Blaziers' SUV swerving or exhibiting other signs of danger. Appellants offer no evidence that the Blaziers' SUV was doing anything other than unwaveringly approaching the crossing prior to 5.4 seconds before the collision. And to avoid summary judgment, Appellants "must provide more than

-5-

conjecture and speculation," but must "designate specific facts creating a triable controversy." *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022) (quoting *McConnell v. Anixter, Inc.*, 944 F.3d 985, 988 (8th Cir. 2019)). Appellants failed to do so here. We thus affirm the district court's grant of summary judgment in favor of DM&E on Appellants' failure to keep a proper lookout claim.[2]

## B. Excessive Speed

Appellants also claim DM&E's locomotive crew acted negligently by traveling at an excessive speed which caused the locomotive's collision with the Blaziers' SUV. The district court concluded this claim was preempted by the Federal Railroad Safety Act (the "FRSA"). We agree.

The Supremacy Clause of the United States Constitution states: "This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Accordingly, "Congress can define explicitly the extent to which its enactments pre-empt state law." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990). Congress did just that in the FRSA's preemption provision, which generally preempts (with exceptions) state laws, regulations, and orders related to railroad safety. *See* 49 U.S.C. § 20106(a)(1)–(2). Under the authority granted by the FRSA and the Secretary of Transportation, *see* 49 U.S.C. § 20103(a); 49 C.F.R. § 1.89(a), the Federal Railroad Administration ("FRA") has prescribed nationally uniform speed limits for locomotives. *See* 49 C.F.R. § 213.9. These speed limits generally preempt excessive speed claims under state law. *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 675 (1993) (holding state-law excessive speed claims are preempted by 49 C.F.R. § 213.9).

---

[2]Because Appellants fail to present evidence sufficient to prove the crew's allegedly improper lookout caused the collision, they also fail to present evidence sufficient to prove DM&E's alleged failure to train the crew to keep a proper lookout caused the collision.

The FRSA clarifies, however, that an action under state law seeking damages for personal injury, death, or property damage is not preempted by federal regulation where the action is based on a railroad's failure to comply with the standard of care provided by federal regulation. 49 U.S.C. § 20106(b). Appellants argue DM&E violated the FRA's speed regulations by traveling at 22.1 miles per hour without the proper lighting and therefore Appellants' excessive speed claim is not preempted. Not so.

It is undisputed that the locomotive was traveling at 22.1 miles per hour as it approached the crossing. It is also undisputed that the general federal speed limit for locomotives on a "Class 3" track, like here, was forty miles per hour. *See* 49 C.F.R. § 213.9(a). Appellants claim, however, that the locomotive violated 49 C.F.R. § 229.125(d), which requires lead locomotives traveling above twenty miles per hour over public highway-rail crossings to have operative auxiliary lights and headlights. Appellants assert there is a genuine dispute about whether a ditch light (which is an auxiliary light) and a headlight on DM&E's locomotive were operative at the time of the collision. They argue that if such lights were not operative at the time of the collision, DM&E's locomotive violated § 229.125(d) by traveling above twenty miles per hour. Appellants then argue the locomotive would not have collided with the Blaziers' SUV had it been traveling under twenty miles per hour.

We hold that even if the disputed lights were not operative, Appellants' excessive speed claim is still preempted. Appellants' argument is chameleonesque. For purposes of preemption, Appellants' excessive speed theory takes the form of an improper lighting theory. Section 229.125(d) requires that a lead locomotive "operated at a speed greater than 20 miles per hour over one or more public highway-rail crossings *shall be* equipped with" the proper lighting. 49 C.F.R. § 229.125(d) (emphasis added). The operative command in this regulation, as indicated by the language "shall be," is the equipping of locomotives with proper lighting. A locomotive's speed is merely a condition that triggers the lighting requirement. In other words, § 229.125(d) is violated by improper lighting, not excessive speed (though speed is relevant in determining proper lighting).

-7-

Once beyond the obstacle of preemption, Appellants drop the improper lighting theory and rely only on excessive speed to get past the causation obstacle. Appellants argue that had the locomotive been going slower, the collision would not have occurred. Appellants do not argue that the DM&E crew or anyone in the Blaziers' SUV could have avoided the collision if all the locomotive's headlights and ditch lights were properly lit.[3]

Thus, Appellants' excessive speed theory is an improper lighting theory for preemption purposes and an excessive speed theory for causation purposes. Appellants cannot have it both ways. They cannot rely on the cover of alleged lighting violations to slip an excessive speed theory past preemption. *See Kurns v. A.W. Chesterton Inc.*, 620 F.3d 392, 398 n.8 (3d Cir. 2010) (concluding "[t]he gravamen of the plaintiffs' claim" was an issue preempted by federal law and that the plaintiffs could not "rebrand [the] claim in order to avoid preemption"), *aff'd sub nom. Kurns v. R.R. Friction Prod. Corp.*, 565 U.S. 625 (2012). Because Appellants do not argue that a lack of lighting contributed to the collision, the gravamen of Appellants' excessive speed theory is simply that the locomotive was moving too fast (as Appellants' own "excessive speed" label would suggest). FRA regulations set the speed limit for the subject locomotive at forty miles per hour. *See* 49 C.F.R. § 213.9. The locomotive was undisputedly traveling under this limit. And we are not persuaded by Appellants' attempt to rebrand the lighting requirements under

_____

[3]Even if Appellants made this argument, they fail to show the locomotive's alleged noncompliance with § 229.125(d)'s lighting requirements proximately caused the collision. *See Grade v. BNSF Ry. Co.*, 676 F.3d 680, 687 (8th Cir. 2012) (noting that even assuming the defendant breached a duty created by a railroad safety statute, the "defendant's negligence is not actionable unless it is a proximate cause of the plaintiff's injuries" (quoting *Scott v. Khan*, 790 N.W.2d 9, 19 (Neb. Ct. App. 2010))); *Gehl ex rel. Reed v. Soo Line R.R. Co.*, 967 F.2d 1204, 1207 (8th Cir. 1992) (applying proximate cause to negligence action against railroad under Iowa law). Appellants present no evidence that a lack of lighting contributed to the collision in any way. Indeed, the collision occurred on a clear day, and it is undisputed that the locomotive had at least one operational headlight and ditch light at the time of the collision.

§ 229.125(d) into an alternative speed limit. Accordingly, the Appellants' excessive speed claim is preempted by 49 C.F.R. § 213.9 and the FRSA.

### III.  Conclusion

For the reasons stated herein, we affirm the district court's grant of summary judgment in favor of DM&E.

_____